UNITED STATES COURT OF INTERNATIONAL TRADE

BEFORE:    THE HONORABLE MARK A. BARNETT, CHIEF JUDGE

---

LECO SUPPLY, INC.,

                Plaintiff,

      v.

UNITED STATES,

                Defendant,

    and

M&B METAL PRODUCTS CO.,

                Defendant-Intervenor.

---

**PUBLIC VERSION**

Consol. Court No. 21-00136

**Business Confidential Information Removed From Pages: 3, 5, 6 ,8, 10-12, 24, 31, 32, 39, 43, and 44**

---

**DEFENDANT'S RESPONSE TO PLAINTIFF'S
MOTION FOR JUDGMENT UPON THE ADMINISTRATIVE RECORD**

Defendant, the United States, respectfully submits this response to the motion for judgment upon the agency record filed by plaintiff, Leco Supply, Inc. (plaintiff or Leco).  ECF Nos. 52, 53.  Plaintiff challenges the U.S. Customs and Border Protection's (CBP) final determination as to evasion concerning certain entries of wire hangers from the Socialist Republic of Vietnam (Vietnam).  As set forth below, CBP's determination that the country of origin for the hangers was not the Lao People's Democratic Republic (Laos), as Leco had indicated its entry paperwork, is supported by substantial evidence.

**I.    Administrative Determination Under Review**

This action challenges CBP's administrative determination, issued under 19 U.S.C. § 1517(f), as to evasion for certain shipments of wire hangers from Vietnam.  Confidential Notice

of Determination as to Evasion in EAPA Consolidated Case No. 7357 (C.R.318) (October 26, 2020) (October 26 Determination); *see also* Administrative Review of Determination of Evasion, "Enforce and Protect Act ("EAPA") Consolidated Case Number 7357; (P.R. 774) (February 24, 2021).  At remand, CBP affirmed its determination. Remand P.R. (R.P.R.) 117 at PR002421..

## II.   <u>Issues Presented For Review</u>

1.    Whether CBP's evasion determination is supported by substantial evidence.

2.    Whether CBP complied with its regulations and the Court's remand order when it accepted the parties' proposed bracketing and public summaries.

3.    Whether CBP's decision to initiate an investigation and consolidate multiple related investigations is subject to judicial review.

<u>STATEMENT OF FACTS</u>

On October 3, 2019, CBP's Trade Remedy Law Enforcement Directorate (TRLED), Office of Trade initiated an investigation under Title IV of the Trade Facilitation and Trade Enforcement Act of 2015 (TFTEA), Pub. L. No. 114-125, 130 Stat. 122 (2016), commonly referred to as the "Enforce and Protect Act" or "EAPA," to determine whether certain shipments of wire hangers had been entered into the customs territory of the United States by means of evasion.  *See* Notice of Initiation of Investigation and Interim Measures in Consolidated EAPA Case No. 7357 (C.R. 63) (January 30, 2020) (Notice of Initiation).

CBP initiated this investigation in response to allegations[1] by defendant-intervenor M&B Metal Products Co. (M&B) that steel wire garment hangers from Vietnam that were covered by

---

[1]  M&B raised allegations against ten separate entities, including the plaintiff to this matter.  *See* P.R. 1-18; C.R. 1-20.  All ten were alleged to have purchased wire hangers from the same manufacturer, allegedly located in Laos.  CBP ultimately found record evidence of evasion for all ten entities.  *See* C.R. 318 (Oct. 26 Determination).  Leco is the only entity to appeal the determination.

antidumping duty order nos. A-552-812 and C-552-813 (the orders) were being transshipped though Laos in order to evade antidumping duties. *See* M&B Allegation Letters and attachments; P.R. 1-18; C.R. 1-20. Wire hangers from Vietnam are subject to a 214.51 percent cash deposit rate, whereas no order covers wire hangers from Laos. C.R. 33 at CR004195.

Specifically, M&B alleged that, between July 2018 and June 2019, the ten United States importers named in the allegation had purchased over 242 million wire hangers from Truong Hong Development Multidisciplinary Group Ltd. (Truong Hong) that were allegedly produced in Laos. C.R. 14 at CR003948. In support of its allegations, M&B asserted that, though import statistics indicated that 487 million hangers had been imported from Vietnam in 2012, imports from that country dropped off sharply as imports from Laos began and imports from the People's Republic of China (China) increased markedly. C.R. 14 at CR003949.[2] Imports from China dropped over the next few years, and "{b}y 2018, imports from China had fallen to just 26 million and imports from Vietnam were less than 2 million, but imports from Laos had surged to 266 million hangers." *Id.* M&B further asserted – based on a site visit conducted a foreign market researcher located in Laos – that Truong Hong's Lao location did not have the capacity to produce the volume of hangers allegedly imported from it, but rather "only produces one container[3] of hangers per month, on average." *Id.* at CR003952 (emphasis omitted). This, M&B explained, was contrary to import information indicating that, on average, 30 or more containers of wire hangers were imported from Truong Hong each month from July 2018 to June 2019. *Id.*

---

[2] The order on wire hangers was published in 2013. See 78 Fed. Reg. 8105; 78 Fed. Reg. 8107.

[3] A "container" of wire hangers contains approximately [          ] cartons. C.R. 318 at CR010329. M&B claimed that Aa carton of wire hangers generally contains approximately [          ]. C.R. 14 at CR003954.

In response to the allegations, and as noted above, CBP initiated an investigation into the imports made by Leco and the nine other entities named in M&B's submissions. C.R. 63.[4]  CBP issued requests for information to Leco (as well as the other nine entities), asking Leco to provide "a thorough narrative explanation of Leco Supply's importing process … to illustrate the process of identifying a foreign manufacturer, distributor, supplier, *etc*., obtaining samples, conducting quality control, and initiating an order for export to the U.S. through to payment of the order and finalizing the transaction."  C.R. 73 at CR004516 (Leco RFI).  CBP also requested the names and contact information for anyone associated with the merchandise at issue, what measures Leco takes to prevent transshipping, and information on any verification of Truong Hong's production capabilities.  *Id.* at CR004517.

CBP also issued a request for information to Truong Hong, asking it to provide:

> (1) a full description of the manufacturing process for hangers, detailed production capabilities and capacities; (2) information about the source of their raw materials, including supporting documentation establishing proof of source; (3) information about their corporate structure and affiliations; and (4) the source of any finished hangers not produced on-site by the supplier, along with other information about those hangers and supporting sales documentation.

C.R. 67; C.R. 318 at CR010323-24.

Truong Hong acknowledged receipt of the request, indicated that it would comply, and requested multiple extensions, each of which CBP granted.  *See* P.R. 79; P.R. 355; P.R. 360; P.R. 514; P.R. 549; P.R. 552; P.R. 598; P.R. 601.  In granting the requests, CBP cautioned that "should CBP fail to receive the response by the aforementioned deadline, CBP may apply inferences adverse to Truong Hong and select from among the facts otherwise available to make

---

[4] Prior to consolidation, CBP initiated an investigation of Leco, assigned case number 7370.  C.R. 54.

the determination as to evasion…"  P.R. 79.   In total, Truong Hong was given 115 days to respond to CBP's request for information.  C.R. 318 at CR010326 n 18.  Notwithstanding this, Truong Hong failed to cooperate with CBP's request for information, submitting *no* substantive response.  *Id.* at CR010326.

Leco timely responded to CBP's request for information.  C.R. 202-257.  In its narrative response, Leco explained that, prior to 2017, it had sourced wire hangers domestically; however, in late 2016, Leco began looking to import hangers and "{u}ltimately …. {i}dentified Truong Hong as a potential source for wire hangers."  C.R. 257 at CR008285.  Leco did not request a sample from Truong Hong, but rather had placed a purchase order for a container of wire hangers in February 2017.  *Id.*  Leco found the hangers to be acceptable, and ultimately ordered [     ] containers – [     ] of which[5] were subject to the underlying investigation.  *Id.*

In its narrative response, Leco explained that it "does not have operating policies and procedures manuals for CBP/import operations…. Prior to 2018, Leco Supply had never imported any merchandise, and no employee of Leco Supply had any experience with or knowledge of importing."  C.R. 257 at CR008286.  Leco further reported that it "did not verify production capabilities at Truong Hong prior to initially importing steel wire garment hangers" because, due to its "lack of any importing experience, Leco Supply was unaware that such investigation was necessary or desirable."  *Id.* at CR008289.  Rather than affirmatively determine the legal requirements to which its imports might be subject, Leco "believed that Truong Hong and {the freight forwarder} were aware of the legal requirements that might be associated with importing into the U.S. and were ensuring compliance on Leco{}'s behalf."  *Id.*  Leco further indicated that its supply contact at Truong Hong was named Bui Viet Vuong and that Leco

---

[5]  The other [     ] containers entered prior to the period of review.

contacted him at [                                    C.R. 257 at CR008304.  Among other

documentation, Leco submitted an "{Association of Southeast Asian Countries (ASEAN)}

Customs Declaration Document" and country of origin certificate  for both entries under

investigation.  C.R. 221 at CR007530-31; C.R. 256 at CR008278-80.

   CBP considered the submissions by all ten entities, and conducted its own investigation,

finding significant deficiencies and inconsistencies in the documentation submitted by Leco and

the other entities.  As an initial matter, because Truong Hong had failed to respond to CBP's

request for information, CBP was unable to "evaluate whether the production and sales

information collected by CBP in the course of this EAPA investigation is accurate."  C.R. 318 at

CR010328.  This was because, to evaluate sales and production information, "CBP must be able

to, among other things, trace a manufacturer's raw material purchases to its accounting system;

through the production process, *i.e.*, starting inventory, work-in-progress, ending inventory, and

finished goods, etc.; and, for instances in which the manufacturer was identified as the exporter,

exportation to the U.S. importer."  *Id.* at CR010328-29.

   Next, as for the customs declarations – allegedly indicating that the wire hangers were

produced in Laos – CBP determined that they had been falsified.  First, the Lao government

informed the CBP Attaché at the United States Embassy in Laos that the [



                                    ]  C.R. 258. (memo. to file); R.C.R. 39 (rebracketed on

remand).  Moreover, the ASEAN Customs declarations "were not completed (specifically fields

9, 14, 21, and 28) or possibly completed incorrectly (field 18), and the harmonized tariff number

declared on box 33 of the ASEAN Customs Declaration, 83025000, was incorrect as this number

pertained to hat-racks, hatpegs, brackets and similar fixtures." C.R. 316 at CR010287; R.C.R. 35 (rebracketed on remand).

Similarly, the certificates of origin were questionable on their face:  CBP found that "{a}ll of the certificates of origin reviewed during the EAPA investigation were issued after the hangers were allegedly exported from Laos" causing CBP to "question what form of verification was conducted by the Ministry to ensure the goods were manufactured in Laos…"  C.R. 316 at CR010288; R.C.R. 35 (rebracketed on remand).  Moreover, "{t}he certificate of origin numbers looked as if they were made using a numbering stamp, instead of being computer generated or pre-printed on the certificates."  *Id.*  CBP explained that "{t}he use of a numbering stamp provides no assurance that each certificate of origin was assigned a unique identification number or that identification numbers were assigned in sequential order," and the {u}se of a numbering stamp could {} simplify the act of counterfeiting certificates of origin."  *Id.*  Based on these findings, CBP rejected "the certificates of origin as proof that the exported hangers were made in Laos."  *Id.*

Next, while Leco provided certain documentation allegedly showing wire hanger inputs being transported to the factory in Laos and receipt of the hangers in Vietnam, neither it nor any of the other entities under investigation provided "through bills of lading to support the place of receipt as Laos."  C.R. 316 at CR010287.  In lieu of through bills of lading, Leco and other entities provided receipts from a trucking company allegedly illustrating transfer of the hangers from Laos to Vietnam.  *Id.*  CBP, however, questioned the documents' veracity, noting that "truck bills were not an acceptable substitute for a through bill of lading," because the "Truck Bills did not include invoice numbers," and "the note saying the containers from Vietnam to Laos for loading and then back to Haiphong, Vietnam for export seemed like it was added for

CBP purposes only."  *Id.*  CBP further "found it odd that the Truck Bills and Application for Remittance forms were written in English rather than Vietnamese or Laotian" and "included an unusual mixture of font types."  *Id.*  Moreover, without the benefit of a response from Truong Hong, CBP explained that it could not "examine the house bills of lading and payment to the freight forwarder to confirm the actual shipment of hangers from Truong Hong's facility in Laos to the port in Vietnam."  C.R. 318 at CR010329.

CBP also questioned the documentation provided to establish payment for the alleged truck transfer from Laos to Vietnam, finding that "{a}ll of the Application for Remittance forms were written in English and some of the Application for Remittance forms were missing information such as the SWIFT code, the beneficiary address, the reference number, and any other unique identifier (*i.e.*, a transaction or confirmation number)."  C.R. 316 at CR010287. Further, it  "appeared as though the P stamps were on the forms before the forms were filled out since the handwriting or typing appeared to be on top of the P stamps."  *Id.* at CR010287-88. Finally, none of the entities provided bank or financial institution transfer receipts to support the alleged payments for truck transfer.  *Id.*

As for the documentation provided to support Truong Hong's alleged purchase of raw materials for delivery in Laos, CBP found several similar discrepancies.  C.R. 316 at CR010288-94.  First, the ASEAN Customs Declarations submitted were similarly determined by the U.S. Attaché to be suspicious, because [


] C.R. 316 at CR010288, CR010290.  In the same vein, "store input slips {for Steel Wire Rod Coils} created by Truong Hong included an unlikely mixture of Laotian and English that we would not expect to be included on an internal company record" and "did not identify the

name of the supplier or reference a purchase order or invoice number." *Id.* at CR010289; *see also* CR010291 (same finding for paper tubes and wrapper papers). Similarly, packing invoices and lists for paper tubes and wrapper papers did not include information CBP expected, including the seller's "address, the sold to party, the purchase order number, payment terms, incoterms, or payment instructions." *Id.* at CR010290. Moreover, certain purchases had been for wrappers with specific printed designs, such as "We Love," "Flowers," "Comet," "Trace," "We Clean Green," and "Dependable Cleaners," yet the invoices were "vague," with no indication of the type of wrapper included on the invoice. *Id.* As CBP explained, "{t}hese omissions and anomalies caused us to suspect the documents were counterfeits." *Id.*

CBP also questioned the documents offered by Leco to establish purchase of the cartons used to package hangers, finding that the "purchase order issued by Truong Hong to Vientiane Carton Factory that Leco provided could not be traced to the VAT invoice that Leco provided, did not match the total quantity of cartons identified on the VAT invoice that Leco provided, did not include prices for the ordered cartons, included different carton sizes, and did not identify if the cartons required customization." C.R. 316 at CR010293-94; R.C.R. 35 (rebracketed on remand). CBP concluded that "{t}hese discrepancies contributed to our concern regarding the authenticity and accuracy of the Vientiane Carton Factory documents." *Id.* at CR010294.

Moreover, CBP found significant overlap between Truong Hong and DNA Investment Joint Stock Company (DNA) – the Vietnamese entity subject to the AD/CVD order – via Leco's contact, Bui Viet Vuong. Based on the responses from Leco and other entities under investigation, as well as its own investigation, CBP found that Bui Viet Vuong had significant ties to DNA, including as a "significant shareholder," serving as its Director- Legal Representative, and sitting on its board. C.R. 316 at CR010280; R.C.R. 35 (rebracketed on

remand).  CBP further found that the email address used by Leco to contact Bui Viet Vuong, vietminh205@yahoo.com, "was the same email address {he} used as General Manager of South East Asia Hamico Export Joint Stock Company to submit documents to the U.S. Department of Commerce in response to the AD Investigation of A-552-812 for hangers from Vietnam."  C.R. 316 at CR010281.  Indeed, Leco's initial RFI response identified [          ] as part of [

                ] contact information.  C.R. 257 at CR008304.  Four of the other entities under investigation also identified [                ] as a point of contact at Truong Hong.  *Id.* at CR010278-79.  Similarly, CBP determined that the website "truonghonghanger.com" had been registered to DNA in [                                    ] and that [

        ]'s emails with Leco included a substantially similar address: [

        ]  *Id.* at CR010279-80.

At the conclusion of its investigation, CBP determined that the record evidence indicated that all ten entities had made entries of wire hangers of Vietnamese origin and misrepresented the country of origin as Laos.  C.R. 318.  CBP based its determination on several factors.  First, CBP found that Truong Hong was associated with DNA, a Vietnamese manufacturer and exporter of wire hangers subject to the Orders on wire hanger.  *Id.* at CR010326-27.  As support for this conclusion, CBP pointed to overlapping personnel between the two entities, with [

        ] and [                                ] holding management positions in both, and both serving as sales representatives to the entities under investigation.  *Id.* at CR010327.  Moreover, CBP found that the submitted documentation allegedly showing Truong Hong's "equipment and production capacity, employees, raw material purchases, and transportation from Laos" was unreliable because: 1) Truong Hong did not respond to CBP's request for information, and 2) the ASEAN customs declarations and Country of Origin

certificates were determined to be fraudulent based on consultation with the Lao government.  *Id*
at CR010328.

Moreover, because Truong Hong failed to respond to CBP's requests, CBP was unable to
"trace {the} manufacturer's raw material purchases to its accounting system; through the
production process *i.e.,* starting inventory, work-in-progress, ending inventory, and finished
goods, *etc*.; and, for instances in which the manufacturer was identified as the exporter,
exportation to the U.S. importer."  *Id.* at CR010328-29.  CBP was thus unable to "evaluate
whether the production and sales information collected by CBP in the course of this EAPA
investigation is accurate."  *Id.*

In the same vein, CBP found facially conflicting information as to the Lao factory's
production capacity.  One importer submitted a letter from Truong Hong indicating that its
capacity was for "10 containers of steel wire garment hangers per month, with 70 regular and
seasonal employees and 19 machines."  C.R. 318 at CR010329; citing C.R. 308 at CR010030.
Another importer provided a similar letter, this one claiming that Truong Hong's capacity was
for "19 containers of steel wire garment hangers per month, with 103 regular and seasonal
employees, and 30 machines."  *Id.,* citing C.R. 313 at CR010230.  And M&B – the domestic
party who had made the original evasion allegation – submitted a report based on a site visit that
found "a total of [    ] employees and [      forming machines, but only [   ] machines were in
use, and the monthly output was [   ] container of hangers."  *Id.*  CBP explained that these
figures could not account for the number of hangers allegedly produced in Laos because:

> {A}ccording to CBP's conservative estimates, [    ] containers a
> month equates to approximately [         ] pieces of hangers a
> month, or [          ] pieces of hangers a year.  CBP data
> indicates that the Importers imported from Truong Hong, with
> country of origin Laos, [          ] pieces of hangers in 2014, [
>           ] pieces in 2015, [          ] pieces in 2016, [

] pieces in 2017, [                ] in 2018, and [
] pieces in 2019.  The Importers imported more than
Truong Hong's alleged capacity by [        ] percent in 2014, [
] percent in 2015, [        ] percent in 2016, [        ] percent
in 2017, [        ] percent in 2018, and [        ] percent in 2019.
With an estimated [            ] pieces of hangers per container, the
Importers had entries of [        ] containers of hangers in 2018, or
an average of [        ] containers a month, and entries of [        ]
containers of hangers in 2019, or an average of [        ] containers a
month.

C.R. 318 at CR010330.

Moreover, CBP explained that, because Truong Hong had failed to respond to CBP's

request for information, the two Truong Hong-drafted letters claiming it had the capacity to

produce [        ] and [        ] containers per month "are unreliable."  *Id.*  Given this, CBP explained

that its "CBP data supports finding approximately [        ] containers in 2018 and [        ]

containers in 2019 were not manufactured by Truong Hong," and, given the overlap between

Truong Hong and DNA's management and business address in Vietnam, "{i}t is reasonable to

conclude based on record evidence that the [        ] containers in 2018 and [        ] containers in

2019 were manufactured in Vietnam."  *Id*.

CBP next determined to apply an adverse inference against Truong Hong, explaining

that, "{p}ursuant to 19 {U.S.C. § 1517(c)(3) and 19 C.F.R. § 165.6}, CBP may apply an adverse

inference if the party to the investigation that filed an allegation, the importer, or the foreign

producer or exporter of the covered merchandise fails to cooperate and comply to the best of its

ability with a request for information made by CBP."  *Id.*  And, CBP explained, it may make this

finding "without regard to whether another person involved in the same transaction or

transactions under examination has provided the information sought…"  C.R. 318 at CR010330-

31 (quoting 19 U.S.C. § 1517(c)(3)(B)).  Because Truong Hong "did not provide a substantive

response to CBP's RFI, despite being afforded an extensive period to do so," CBP made the

determination to "apply adverse inferences and infer that Truong Hong did not have the capacity

to manufacture the amount of imports that the Importers brought into the United States with the

country of origin listed as Laos." *Id.* at CR010331. Applying this inference,[6] as well as

information gathered in its investigation, CBP determined "that substantial evidence exists

demonstrating that the Importers misrepresented the country of origin on their imports of hangers

by claiming Laos rather than Vietnam as the country of origin" and that "{e}vidence on the

record strongly suggests that a Truong Hong {affiliate} in Vietnam actually manufactured the

hangers, thus the Importers avoided paying cash deposits for the Vietnam AD and CVD orders

on their imports to the United States." *Id.*

    Leco timely requested reconsideration of CBP's evasion determination, C.R. 319, and

CBP undertook a *de novo* review. P.R. 774. CBP affirmed its evasion determination, explaining

that the "issue of the reliability of the production documentation, coupled with the evidence

demonstrating significant ties between Truong Hong and a Vietnamese company that produces

covered merchandise, meets the standard of substantial evidence that evasion occurred when

Leco Supply misrepresented the country of origin as Laos." P.R. 774 at 9. CBP further

explained that, though the RAAAS Summary of Facts memorandum was redacted in full on the

record, "an example of the questionability of the documents can be seen within the public

record" where "the receipts for packaging materials provided by Leco Supply were printed on

---

[6]CBP also made a determination to apply an adverse inference against the importers due
to the submission of fraudulent documents and the failure of certain importers to respond to
CBP's requests for information. C.R. 381 at CR010331. Leco requested reconsideration, and
CBP rescinded that finding with respect to Leco. P.R. 774 at 11. R&R, however, confirmed that
"even without adverse inferences, the record fully and adequately supports the finding that the
wire hangers are of Vietnamese origin and Leco Supply misrepresented the country of origin as
Laos resulting in evasion of the payment of AD and CV duties upon importation into the United
States." *Id.*

Truong Hong's own letterhead." *Id.* CBP explained that "{t}his is the type of documentation that, if legitimate, would have been generated by the third party raw material or packaging material supplier." *Id.*

In addition to the questionable documentation, CBP explained that the record did not illustrate that Truong Hong had the production capacity required to produce the volume of hangers it allegedly produced, and that Leco, in any event, had not submitted an documents regarding production capacity in its responses nor visited the factory before placing an order. *Id*. Based on this, combined with Truong Hong's failure to respond to CBP's request for information – despite acknowledging that request and receiving several extensions – CBP confirmed its determination that "nothing within the record indicates that Truong Hong was ever able to produce wire hangers at such a level to meet the amount it exported to the United States during the period of investigation." P.R. 774 at 11.

Finally, CBP explained that the connection between Truong Hong and DNA – a Vietnamese hanger producer subject to the AD/CVD order – was "more than circumstantial" as Leco claimed. *Id*. CBP explained that there is "clearly a relationship between Truong Hong and DNA/SEA Hamico … as many of the same individuals who represented Truong Hong in communications with the importers were also involved in the operations of DNA/SEA Hamico." *Id*. CBP explained that "{t]his relationship is further seen in those individuals' use of the same email addresses when communicating on behalf of both companies" and "individuals who communicated with the importers as employees of Truong Hong do not appear on the company's employee list indicating payment into Laos's National Social Security Fund on their behalf." *Id*. CBP further noted that "while Leco Supply did not visit the factory in Laos to verify production" its general manager *did* meet with Truong Hong personnel "to make a personal connection" in

Vietnam.  *Id.* at 10-11.

CBP also defended its decision to consolidate the investigations and evaluate the record evidence as a whole, explaining that "all ten (10) importers used the same manufacturer during the same period of time and CBP utilized its discretion to consolidate the EAPA investigations. The administrative record, as a whole, was examined and reviewed to find substantial evidence of evasion."  *Id.* at 11.  Based on this, CBP affirmed its determination that evasion had occurred. *Id.*

Leco timely challenged CBP's determination in this Court.  ECF No. 1.  After filing the administrative record, we realized that certain documents had been inadvertently omitted and filed a motion to amend the record on July 22, 2021.  ECF No. 34.  Following a videoconference with the parties, we sought a voluntary remand to allow CBP's "Regulations and Rulings" office (R&R) – the same entity that undertook the *de novo* review of CBP's evasion determination – to reconsider its decision in light of the revelation that certain documents had not been transmitted to R&R for review.  ECF No. 39 at 3.  We also sought the remand for CBP "to consider the allegations raised in plaintiff's complaint regarding CBP's compliance with its  regulations, and take any action it believes necessary to address and remedy any lack of adherence to its regulations."  *Id.* at 1-2.  The Court granted the motion, directing CBP to provide R&R with "any and all documents collected during the investigation and omitted from the record prior to R&R's original *de novo* review;" "review the record and ensure compliance with the public summary requirement set forth in 19 C.F.R. § 165.4;" "afford Plaintiff and Defendant-Intervenor an opportunity to submit information and arguments responsive to any information previously omitted from the public record;" and "consider Plaintiff's argument regarding CBP's compliance with 19 C.F.R. § 165.4(a) and the type of information for which business confidential treatment

is permitted, and remedy any deficiencies, as appropriate."  ECF No. 42.  The Court also ordered

Leco to "exhaust their administrative remedies with respect to any remaining procedural due

process issue that is within the scope of this remand order."  *Id.*

On remand, CBP reopened the record, permitting Leco and M&B "to submit information

they would have submitted if the parties had access to the information included in the revised

public versions of these documents during the investigation."  ECF No. 47 at 10.  Leco submitted

rebuttal information concerning the certificates of origin, the ASEAN import/export declarations,

truck bills, and the foreign manufacturer's production capacity.  R.P.R. 10-75.

Also during remand, M&B un-bracketed the tables of contents to the foreign market

report it had commissioned, but continued to request that the substance be granted business

confidential treatment in its entirety.  M&B explained its request as follows:

> This exhibit contains the {foreign market research} report commissioned by
> M&B and contains business confidential information throughout the report.
> Specifically, the {foreign market research} report contains trade secrets of the
> foreign market research firm because it describes in great detail the methods and
> practices of the firm in conducting its investigations as well as the sources of
> information on which its conclusions are based.  Disclosure of the identity of the
> firm or its sources would adversely affect the ability of the firm to continue its
> business and could put employees of the firm and their sources at risk for
> retaliation or worse.  In addition, disclosure of this information to the public
> would enable those intent on evading lawful antidumping and/or countervailing
> duties to take steps that could mask their activities.

R.P.R. 30 at 2.

M&B similarly partially un-bracketed exhibit 7 to its allegation, but explained that the

remaining information should be treated as business confidential because "the information in this

exhibit is derived from M&B's business confidential commercial operations and M&B's trade

secrets regarding the types and capabilities of the equipment which it uses to manufacture steel

wire garments."  *Id.*

CBP filed its remand redetermination, as well as the remand administrative record, on

November 11, 2021.  ECF Nos. 47, 48, 49.  In its redetermination, CBP addressed Leco's

argument regarding the bracketing of information on remand, explaining that the Court did not

order release of business confidential information, but rather for CBP to ensure that it complied

with its regulations.  ECF No. 47 at 13.  CBP explained that, in accordance with this, "CBP

provided revised public versions, including public summaries, for a number of documents."  *Id.*

at 14.  By way of example, "analysis reports {that} CBP had previously claimed were not

capable of summarization now have the relevant public summary."  *Id.*

 As for the information for which M&B requested confidential treatment, CBP

"determined that M&B provided an adequate explanation requesting business confidential

treatment for its documents, as well as certain pages of the narrative in its allegation."  *Id.*  This

was because, CBP explained, "the public versions with public summaries, as well as explanation

justifying the continued and revised confidential treatment, permitted a reasonable understanding

of the underlying substance of the information."  *Id.* at 14-15.  In response to Leco's assertion

that the information should not be considered business confidential, CBP explained that it " has

limited information that would allow it to question claims to confidential treatment by a third

party and relies on the justification provided by the parties when determining whether to grant a

claim to such confidential treatment under" 19 C.F.R. § 165.4(a).  *Id.* at 15.  Because "M&B

provided sufficient explanation as to why the information it sought to withhold as confidential

qualified as 'commercial or financial information,'" CBP thus permitted the information to

remain bracketed.  *Id.*  CBP further noted that Leco had requested that eleven documents be

bracketed in their entirety because "{t}he identity of the individuals and companies with whom

{Leco} corresponds in the course of business, and the actual content of such correspondence, is

confidential commercial information, the disclosure of which is likely to cause substantial

competitive harm to Leco." *Id.* (quoting R.P.R. 3 at 3).  As with M&B, CBP accepted Leco's

proposed bracketing.  *Id.* at 17.

CBP also revised the bracketing of several documents it has placed on the record,

including the RAAAS Summary of Factual Information.  *Id.* at 19.  CBP explained that, rather

than continue to redact the document in full, on remand it "reviewed the document line by line,

comparing to the claims for business confidential treatment made by interested parties in

corresponding source submissions and provided revised bracketing of the document, including

public summaries, with the information redacted clearly described within those brackets."  *Id.*

CBP also provided summaries of the redacted information, explaining that the redactions

"contained partial entry number information, dates of entry, names of entities that CBP received

certain documentation from and the type of that documentation."  *Id.*  CBP determined that it had

complied with its regulations because"{t}he public summaries and the context surrounding the

brackets were sufficient to permit a reasonable understanding of the substance of information."

*Id*.

CBP next considered the rebuttal information submitted by Leco, but concluded that

there existed substantial evidence of evasion on remand.  First, CBP explained that,

notwithstanding the additional information submitted by Leco, it still did not receive "any

substantive response directly from the foreign manufacturer applicable to its production

capacity" nor "any documentation from the foreign manufacturer concerning actual production,

raw material purchases, inventory, employees' records, movement of finished goods, and any

financial records."  *Id.* at 21.  Thus, CBP was "unable to examine the manufacturer's accounting

or production records to confirm {that} its production of hangers occurred in Laos."  *Id.*  CBP

further explained that the rebuttal information was not sufficient to overcome "the totality of

information on the administrative record, including Leco's acknowledgement that it met with representatives of the foreign manufacturer in Vietnam and CBP's recognition that those same representatives of the foreign manufacturer were involved in the Department of Commerce's AD/CVD investigation on behalf of a Vietnamese-based entity." *Id.* at 21-22.  Moreover, CBP "continue{d} to doubt the authenticity of certain information, such as the certificates of origin," notwithstanding the rebuttal information submitted by Leco, because "while Leco attempted to support the legitimacy of these documents on remand by providing information about the specific issuer, Leco also conceded that the issuer does not physically inspect production facilities, and instead, issues the certificates only upon inspection of documentation provided by the exporter." *Id.* at 22.  CBP ultimately concluded that, notwithstanding the additional documents provided by Leco, its initial evasion determination should not be disturbed.  *Id.*

## **LEGAL STANDARD**

### I.   **The Enforce And Protect Act**

In 2016, the President signed into law The Trade Facilitation and Trade Enforcement Act of 2015 (TFTEA), Pub. L. No. 114-125, 130 Stat. 122 (2016).  Title IV, Section 421 of TFTEA, commonly referred to as the "Enforce and Protect Act" or "EAPA," established a new CBP administrative procedure for investigating allegations of evasion of antidumping and countervailing duty (AD/CVD) orders as part of the agency's efforts to ensure a level playing field for domestic industries.  *See generally* https://www.cbp.gov/sites/default/files/assets/ documents/2016Oct/Trade%20Facilitation%20and%20Trade%20Enforcement%20Act%20of%2 02015%20-%20Overview.pdf.

Under EAPA, Federal agencies or interested parties—including U.S. and foreign manufacturers, producers, exporters; certified unions or recognized unions or groups of workers;

and trade or business associations in a particular industry—may submit allegations to CBP that reasonably suggest that merchandise covered by an AD/CVD order has entered the United States through evasion.  Generally, the investigation of an EAPA allegation proceeds as follows: Within 15 calendar days of receiving an allegation, if CBP determines that the allegation reasonably suggests covered merchandise has been entered through evasion, CBP must initiate an investigation, 19 U.S.C. § 1517(b)(1), and within 90 calendar days, CBP must make an initial determination of whether there is reasonable suspicion of evasion and, if so, issue interim measures, which includes the suspension and extension of certain entries, 19 U.S.C. § 1517(e). The EAPA statute grants CBP broad discretion to determine the investigation's scope and means, including authority to collect and verify any information it deems necessary to make its evasion determination.  19 U.S.C. § 1517(c)(2).  CBP's regulations set forth the types of and requirements for the submission of factual information by parties.  19 C.F.R. § 165.23.  For example, parties to the investigation may voluntarily submit information to CBP or may provide information in response to requests by CBP.  *Id.*  Parties to the investigation have 200 days from the date on which the investigation was initiated to submit factual information on the record, and 230 calendar days to submit written arguments.  *Id.*  Parties to the investigation have 15-calendar days to submit responses to other parties' written arguments.  *Id.*  Interested parties who are not parties to the investigation may also provide information in response to requests by CBP.  *Id.*

During the investigation, CBP maintains an administrative record of material obtained and considered by CBP during the investigation, as well as record information submitted by interested parties.  19 U.S.C. § 1517(c)(2); 19 C.F.R. § 165.21.  No later than 300 calendar days after the investigation's initiation, CBP is required to make a determination as to whether the administrative record contains evidence to reasonably conclude that AD/CVD duties have been

evaded.[7]  19 U.S.C. § 1517(c)(1)(A); 19 C.F.R. § 165.22.  Interested parties are permitted to

request an administrative review of the initial determination, and CBP must complete the review

and issue a final administrative determination no later than 60 days after such a request.  19

U.S.C. § 1517(f).  EAPA allows for judicial review in this Court of CBP's final administrative

determination and the original determination as to evasion, provided the matter is initiated within

"30 business days" after CBP completes a review under subsection (f).  19 U.S.C. §  1517(g)(1).

## II.    <u>Standard Of Review</u>

In reviewing CBP's evasion determinations, this Court determines whether CBP

complied with procedures under the EAPA statute and whether any determination, finding, or

conclusion is arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with

law.  19 U.S.C. § 1517(g)(2).

"Courts look for a reasoned analysis or explanation for an agency's decision as a way to

determine whether a particular decision is arbitrary, capricious, or an abuse of discretion."

*Wheatland Tube Co. v. United States*, 161 F.3d 1365, 1369 (Fed. Cir. 1998).  "An abuse of

discretion occurs where the decision is based on an erroneous interpretation of the law, on factual

findings that are not supported by substantial evidence, or represent an unreasonable judgment in

weighing relevant factors."  *WelCom Prods., Inc. v. United States*, 865 F. Supp. 2d 1340, 1344

(Ct. Int'l Trade 2012) (citing *Star Fruits S.N.C. v. United States*, 393 F.3d 1277, 1281 (Fed. Cir.

2005)).  "An agency action is arbitrary when the agency offers insufficient reasons for treating

similar situations differently."  *SKF USA Inc. v. United States*, 263 F.3d 1369, 1382 (Fed. Cir.

2001).

---

[7] CBP may issue notice of an extension of time of 60 days, provided certain requirements
are met, to render its determination.  19 U.S.C. § 1517(c)(1)(B).

When reviewing CBP's determinations, "absent constitutional constraints or extremely compelling circumstances," this Court "will defer to the judgment of an agency regarding the development of the agency record." *PSC VSMPO-Avisma Corp. v. United States*, 688 F.3d 751, 760 (Fed. Cir. 2012) (explaining the Court's role in reviewing Commerce's antidumping duty administrative determinations). "To do otherwise would 'run the risk of propelling the courts into the domain which Congress has set aside exclusively for the administrative agency.'" *Id.* (quoting *FPC v. Transcon. Gas Pipe Line Corp.*, 423 U.S. 326, 333 (1976)). Rather, "{t}he role of judicial review is limited to determining whether the record is adequate to support the administrative action." *PSC*, 688 F.3d at 761; *see also Essar Steel Ltd. v. United States*, 678 F.3d 1268, 1278 (Fed. Cir. 2012) (reversing order instructing Commerce to consider extra-record information because "the trial court's order usurps agency power, undermines Commerce's ability to administer the statute entrusted to it, contradicts important principles of finality, and discourages compliance").

## ARGUMENT

### I.     CBP's Determination Is Supported By Substantial Evidence

CBP's evasion determination is supported by substantial evidence, and Leco's assertions to the contrary amount to nothing more than disagreement with how CBP weighed and considered record evidence. But the "substantial evidence" standard does not mean – as Leco appears to assert – that CBP must establish that no other conclusion could possibly be drawn from the record. Rather, "substantial evidence" requires only that an agency enunciate "a 'rational connection between the facts found and the choice made.'" *Royal Brush Mfg., Inc. v. United States*, 545 F. Supp. 3d 1357, 1365 (Ct. Int'l Trade 2021) (*Royal Brush II*) (quoting *Motor Vehicle Mfrs. Ass'n of U.S., Inc. v. State Farm Mut. Auto. Ins. Co.*, 463 U.S. 29, 43 (1983)). That

another conclusion could rationally be drawn from the record evidence does not defeat an agency's determination. *Id.*

As an initial matter, Leco's motion ignores completely CBP's application of an adverse inference against Truong Hong, and the impact of that finding on CBP's determination; Leco instead repeatedly asserts that CBP applied an "unacknowledged" adverse inference against it. Pl. Br. at 14. But the adverse inference CBP applied is far from "unacknowledged" – as CBP explained in its initial determination, Truong Hong was in receipt of CBP's request for information, indicated that it intended to comply, and was given ample time to respond – with CBP granting *multiple* requests for extension, for a total of 115 days. C.R. 318 at CR010326 n. 18. Notwithstanding this, Truong Hong provided *no substantive response* to CBP's requests. *Id.* at CR010331. The result of this omission was that CBP was unable to "evaluate whether the production and sales information collected by CBP in the course of this EAPA investigation is accurate." *Id.* at CR010328. Based on this, CBP found that Truong Hong had failed to cooperate to the best of its ability and applied an adverse inference, inferring that "Truong Hong did not have the capacity to manufacture the amount of imports that the Importers brought into the United States with the country of origin listed as Laos." *Id.* at CR010331. CBP further determined that "because Truong Hong failed to respond to the RFI, any documentation purported to be from Truong Hong and submitted by the Importers shall be deemed unreliable." *Id.* at CR010328.

This finding is central to CBP's analysis, and unchallenged in Leco's submissions to the agency or motion before this Court; any challenge to it is thus waived. 28 U.S.C. § 2637(d). Moreover, CBP's determination to apply such an inference is in accordance with statute, which provides that CBP may apply an adverse inference against an interested party who "has failed to

cooperate by not acting to the best of the party or person's ability to comply with a request for information…" 19 U.S.C. §1517(c)(3)(A). The statute further provides that a "foreign manufacturer, producer, or exporter" is an "interested party" for the purposes of applying an adverse inference. *Id*. at §§ (a)(6)(A)(i); (c)(3)(A). And, the inference may be applied "without regard to whether another person involved in the same transaction or transactions under examination has provided the information sought by {CBP}, such as import or export documentation." *Id*. at § (c)(3)(B).

Moreover, the adverse inference applied by CBP is supported by other record evidence. First, M&B's allegation asserted that its agent had visited the factory and determined that Truong Hong produced approximately [    ] container of hangers per month; far below the production volume required to produce all of the allegedly Lao-produced hangers. C.R. 5 at CR001565. Similarly, two different importers submitted letters allegedly from Truong Hong, one asserting a capacity of [    ] containers per month and the other [    ]. C.R. 318 at CR010329. While the higher capacity could potentially account for all importer hangers, CBP found the assertion to be unreliable given Truong Hong's failure to respond directly to CBP's requests. *Id*.

In addition to finding the reported production capacities unreliable, CBP found inconsistencies in the data submitted by importers (and allegedly from Truong Hong) to support the assertion that Truong Hong had the capacity to produce the hangers. First, CBP received conflicting data about Truong Hong's tube fixing machines, with two importers claiming it has 5 paper tube fixing machines, and another claiming it has 10. C.R. 316 at CR010283; R.C.R. 35 (rebracketed on remand). Similarly, CBP received conflicting information about Truong Hong's paint assembly line, with one importer claiming it could paint 30,500 hangers per hour, and another 32,5000. *Id*. at CR010284. In the same vein, one importer reported Truong Hong has 22

hanger forming machines, another 24, and a third 29. *Id.* As all of this information was allegedly provided *by Truong Hong to the importers*, CBP's determination that the inconsistencies indicated that Truong Hong did not possess the required production capacity was not arbitrary or capricious.

Leco ignores these conclusions, asserting that "{d}ocuments stamped and signed by Truong Hong and submitted by the importers demonstrate that at the time of export of Leco's hangers {},Truong Hong had at least 18 hanger forming machines with a 1250/hour capacity, and 6 strut hanger forming machines with a 1650/hour capacity, for a total production capacity of 32,400 hangers per hour." Pl. Br. at 14. Thus, Leco concludes, "evidence on the record supports a conclusion that Truong Hong could have produced all of the hangers that it exported during the time periods relevant to Leco Supply's entries." *Id.* at 15. Essentially, Leco takes the most favorable scenario based on all of the conflicting information asserted, and then argues that such a scenario is the only possible one, and as such CBP could not have found otherwise. Leco ignores both CBP's application of an adverse inference and the applicable "substantial evidence" standard that this Court applies in reviewing CBP's determination, and Leco's assertions are unavailing.

Leco continues its misstatement of the law, next arguing that "the substantial evidence on the record supports the conclusion Truong Hong had the capacity and did produce Leco's imported hangers in Laos." Pl. Br. at 16 (internal quotation omitted). But, again, "substantial evidence" does not mean "whichever assertion has the most pieces of information placed on the record," but rather whether CBP identifies "a 'rational connection between the facts found and the choice made.'" *Royal Brush II,* 545 F. Supp. 3d at 1373 (quoting *Motor Vehicle Mfrs*, 463 U.S. at 43). Leco appears to argue that, because record evidence indicates that Truong Hong had

the capacity to produce at least one container per month, and Leco only imported two during the period of investigation, "it is undisputed that Truong Hong had sufficient production capacity in Laos to produce Leco's hangers." Pl. Br. at 17. Here and elsewhere in its motion, Leco appears to advance a novel legal theory: even though statute expressly permits CBP to consolidate investigations, as it did here, it may not consider the total weight of the entire record in making an evasion determination. Rather, Leco implies, CBP – without the benefit of a substantive response from Truong Hong detailing its production capacity, and faced with a wildly inconsistent record – must affirmatively determine that the precise hangers imported by Leco were produced elsewhere. *Id.* But such a legal requirement would impermissibly shift the burden to CBP to create the record, as opposed to requiring interested parties to do so. Put another way, Leco argues for a legal framework under which a foreign producer like Truong Hong can fail entirely to response to CBP's requests for information, and CBP must nevertheless give importers like Leco the benefit of the doubt as long as there is *some evidence* that some amount of product was produced where it is claimed to have been produced.

And, under Leco's construction, CBP must do so for all ten importers here, giving *each* the benefit of the doubt and assuming that whatever the minimum amount of product that could have been produced is, all ten were the recipients of it. Such a reading of the law is contrary to the EAPA statute, not to mention the entire legal framework concerning foreign imports entering the United States. Both this Court and the United States Court of Appeals for the Federal Circuit have repeatedly held that the foreign producer or importer bears the burden to provide sufficient evidence to establish the origin of the product it seeks to enter. *See, e.g. Allied Tube & Conduit Corp. v. United States*, 132 F. Supp. 2d 1087, 1094 (Ct. Int'l Trade 2001); *Fujitsu Gen. Ltd. v. United States*, 88 F.3d 1034, 1040 (Fed. Cir. 1996); *Primary Steel, Inc. v. United States*, 834 F.

Supp. 1374, 1383 (Ct. Int'l Trade 1993).  Yet Leco's construction would permit importers to

benefit greatly from a foreign producer that declines to cooperate with CBP, incentivizing parties

to withhold information.

Leco next asserts that CBP improperly "rejected" documents submitted by Leco,

"showing production of its hangers in Laos."  Pl. Br. at 17.  But CBP did not "reject" – as in

decline to consider – Leco's documents; it simply looked at all the information placed on the

record, and reached a conclusion as to whether evasion occurred.  Leco contests CBP's analysis

of both the certificates of origin and ASEAN declarations, arguing that it is "factually incorrect,

predicated on incorrect assumptions, utterly unrelated to the document in question, or lacking

reasoned analysis."  *Id.*  To the contrary, CBP's determination that the documents were

unreliable is supported by substantial evidence.

For the customs declarations – allegedly indicating that the wire hangers were produced

in Laos – CBP determined that they had been falsified.  First, the Lao government informed the

CBP Attaché at the United States Embassy in Laos that the ASEAN customs declarations were

falsifications and were suspicious on their face because "1) the People's Republic of China {} is

not a party to ASEAN, and 2) the exporter or importer company name is in  Laotian however all

ASEAN documents must be in English."  C.R. 258. (memo. to file); R.C.R. 35 (rebracketed on

remand).  Moreover, the ASEAN Customs declarations "were not completed (specifically fields

9, 14, 21, and 28) or possibly completed incorrectly (field 18), and the harmonized tariff number

declared on box 33 of the ASEAN Customs Declaration, 83025000, was incorrect as this number

pertained to hat-racks, hatpegs, brackets and similar fixtures."  C.R. 316 at CR010287.

On remand, CBP explained that Leco's "rebuttal information and its arguments {are}

unpersuasive in terms of refuting any concerns with the reliability and validity of the ASEAN

documentation submitted." ECF No. 47 at 33. Nevertheless, Leco argues – as it did on remand – that inaccuracy or inconsistency in the ASEAN documentation *makes them more credible* because "CBP has surely encountered myriad instances of authentic U.S. import and export declarations that nevertheless contain misclassifications or other false statements due to mistake or ignorance." Pl. Br. at 19; *see also* ECF No. 47 at 33 (Leco arguing that "{m}isclassification of the hangers upon export…is entirely understandable" because "{e}xports of hangers from Laos, regardless of classification, are duty free" and "the paperwork was completed by an individual who likely had little customs expertise, and the specific information declared had no impact on duties or taxes owed.") But CBP considered and rejected this argument as "incredulous," explaining that it "disagrees that incorrect classification on export documents constitutes a 'minor error' for purposes of the present evasion determination, and, in light of the substantial evidence on the record … continues to determine there was evasion." ECF No. 47 at 33. Leco's argument amounts to nothing more than disagreement with how CBP considered and weighed record evidence.

Similarly, CBP's determination that the certificates of origin were questionable on their face is reasonable. CBP found that "{a}ll of the certificates of origin reviewed during the EAPA investigation were issued after the hangers were allegedly exported from Laos" causing CBP to "question what form of verification was conducted by the Ministry to ensure the goods were manufactured in Laos…" C.R. 316 at CR010288. Moreover, "{t}he certificate of origin numbers looked as if they were made using a numbering stamp, instead of being computer generated or pre-printed on the certificates." *Id.* CBP explained that "{t}he use of a numbering stamp provides no assurance that each certificate of origin was assigned a unique identification number or that identification numbers were assigned in sequential order," and the {u}se of a

numbering stamp could {} simplify the act of counterfeiting certificates of origin." *Id.* Based on these findings, CBP rejected "the certificates of origin as proof that the exported hangers were made in Laos." *Id.*

Leco argues that CBP erred because its "generalized musings about the potential for numbered stamping to 'simplify' counterfeiting are irrelevant and prejudicial. Leco's certificates of origin are exactly what they are supposed to be, no more and no less, and therefore form a legitimate part of the overall documentation for hangers produced in Laos." Pl. Br. at 18. But Leco's arguments again amount to nothing more than disagreement with how CBP weighed the record as a whole and reached its determination. On remand, CBP considered the additional rebuttal information submitted by Leco, but continued to doubt the documents' authenticity, noting that even Leco "conceded that the issuer does not physically inspect production facilities, and instead, issues the certificates only upon inspection of documentation provided by the exporter." ECF No. 47 at 22. Given the adverse inference applied against Truong Hong, and the agreement that the certificates – even if genuine – are based only on Truong Hong's assertions about its facilities, CBP's determination is reasonable.

Next, although Leco provided certain documentation allegedly showing wire hanger inputs being transported to the factory in Laos and receipt of the hangers in Vietnam, neither it nor any of the other entities under investigation provided "through bills of lading to support the place of receipt as Laos." C.R. 316 at CR010288. In lieu of through bills of lading, Leco and other entities provided receipts from a trucking company allegedly illustrating transfer of the hangers from Laos to Vietnam. *Id.* Leco again disagrees with the conclusions that CBP drew from the record as a whole, arguing that CBP provided no "reasoned analysis or explanation" for its determination that the documents provided were not sufficient substitutes for "through bills of

lading."  Pl. Br. at 21 (quoting *Wheatland Tube Co. v. United States*, 161 F.3d 1365, 1369 (Fed.

Cir. 1998)).  To the contrary, CBP clearly explained its analysis, explaining that "truck bills were

not an acceptable substitute for a through bill of lading," because the "Truck Bills did not include

invoice numbers," and "the note saying the containers from Vietnam to Laos for loading and

then back to Haiphong, Vietnam for export seemed like it was added for CBP purposes only."

C.R. 316 at CR010288; R.C.R. 35 (rebracketed on remand).  CBP further "found it odd that the

Truck Bills and Application for Remittance forms were written in English rather than

Vietnamese or Laotian" and "included an unusual mixture of font types."  *Id.*  Moreover, without

the benefit of a response from Truong Hong, CBP explained that it could not "examine the house

bills of lading and payment to the freight forwarder to confirm the actual shipment of hangers

from Truong Hong's facility in Laos to the port in Vietnam."  C.R. 318 at CR010329.

      CBP also questioned the documentation provided to establish payment for the alleged

truck transfer from Laos to Vietnam, finding that "{a}ll of the Application for Remittance forms

were written in English and some of the Application for Remittance forms were missing

information such as the SWIFT code, the beneficiary address, the reference number, and any

other unique identifier (*i.e.*, a transaction or confirmation number)."  C.R. 316 at CR010287.

Further, it appeared as though the P stamps were on the forms before the forms were filled out

since the handwriting or typing appeared to be on top of the P stamps."  *Id.* at CR010287-88.

Finally, none of the entities provided bank or financial institution transfer receipts to support the

alleged payments for truck transfer.  *Id.*  Leco again merely disagrees with how CBP weighed

and considered the record evidence, and its assertions fail.

      As to the invoices for purchases of raw materials, CBP explained that the documentation

submitted was not sufficient to establish their authenticity because of inconsistencies, including

the use of English on Lao and Vietnamese documents, the lack of invoice numbers on the truck bills, and proof of payment documents missing a reference number of including an incorrect SWIFT number. ECF No. 47 at 33-34. Moreover, CBP noted that "the documents the importers submitted, which the importers alleged originated from the foreign manufacturer were, at best, self-generated receipts for purchases of raw materials and packing materials which meant that the authenticity of the documentation was questionable." *Id.* Given the adverse inference applied against Truong Hong, it was reasonable to question the authenticity of self-generated receipts with no independent corroboration.

Finally, Leco argues that "{i}n the absence of any other evidence indicating evasion," the relationship between Truong Hong and DNA cannot support a finding of evasion. Pl. Br. at 25. Of course, additional evidence of evasion is far from "absent" for the record : the relationship between DNA and Truong Hong was one of several bases for CBP's determination. And the evidence of the relationship was substantial: CBP found that Bui Viet Vuong had significant ties to DNA, including as a "significant shareholder," serving as its Director- Legal Representative, and sitting on its board. C.R. 316 at CR010280. CBP further found that the email address used by Leco to contact Bui Viet Vuong, vietminh205@yahoo.com, "was the same email address {he} used as General Manager of South East Asia Hamico Export Joint Stock Company to submit documents to the U.S. Department of Commerce in response to the AD Investigation of A-552-812 for hangers from Vietnam." C.R. 316 at CR010281. Indeed, Leco's initial RFI response identified [          ] as part of [                    ] contact information. C.R. 257 at CR008304. Four of the other entities under investigation also identified [                ] as a point of contact at Truong Hong. *Id* at CR010278-79. Similarly, CBP determined that the website "truonghonghanger.com" had been registered to DNA in [

] and that [                    ]'s emails with Leco included a

substantially similar address: [                    ] *Id.* at CR010279-80.  Given the

totality of the record considered by CBP, its finding of a connection between Truong Hong and

DNA – subject to the AD/CVD order in Vietnam – was reasonable.

 As set forth above, Leco's arguments amount to nothing more than disagreement with

how CBP reviewed and weighed the record as a whole.  But, given the record evidence – not to

mention the adverse inference applied against Truong Hong (which Leco failed to challenge) –

CBP's evasion determination is supported by substantial evidence.

## II.  Leco's Procedural Arguments Fail

 In addition to contesting the substance of CBP's determination, Leco also advances a

series of procedural challenges.  As set forth below, each fails.

### A.  *The Business Confidential Redactions Are In Accordance With Regulation*

 Leco first argues that "CBP's refusal to require rebracketing of documents not in

compliance with its regulations, despite Leco's objections, violates this Court's Remand Order

and CBP's own regulations, and is therefore arbitrary, capricious, an abuse of discretion and is

not in accordance with law."  Pl. Br. at 26.  As set forth below, the bracketing and public

summaries are in compliance with CBP regulation and law, and Leco has failed to establish that

– under the Court's "fact-based" due process inquiry – those summaries prevented it from

advancing any arguments or placing any documents on the record that it otherwise would have.

#### 1.  *Legal Standard*

 Unlike in AD/CVD proceedings, the EAPA statute does not provide a mechanism for the

issuance of an administrative protective order or otherwise to permit parties to view the full

confidential record during administrative proceedings before CBP.  *See* 19 U.S.C. § 1519.  CBP

– like all other federal agencies – is thus subject to the statutory requirement barring disclosure of any information that "concerns or relates to the trade secrets, processes, operations, style of work, or apparatus, or to the identity, confidential statistical data, amount or source of any income, profits, losses, or expenditures of any person, firm, partnership, corporation, or association; or permits any income return or copy thereof or any book containing any abstract or particulars thereof to be seen or examined by any person except as provided by law."  18 U.S.C. § 1905; *see also* 5 U.S.C. §552(b)(4) (providing that the general requirement that an agency make public information underlying a determination does not apply to "trade secrets and commercial or financial information obtained from a person and privileged or confidential.")  Thus, in accordance with statute, CBP has promulgated regulations that permit entities to request that CBP treat any portion of a submission that "consists of trade secrets and commercial or financial information obtained from any person, which is privileged or confidential in accordance with 5 U.S.C. 552(b)(4)" as "business confidential."  19 C.F.R. § 165.4(a).  In order to request such treatment, a party must "clearly state" its request on the first page of a submission, "enclose{e} the claimed confidential information within single brackets," and "provide … an explanation of why each item of bracketed information is entitled to business confidential treatment."  *Id.* at (a)(1).  The requesting party must further provide "a summary of the bracketed information in sufficient detail to permit a reasonable understanding of the substance of the information," or, "{i}f the submitting interested party claims that summarization is not possible, the claim must be accompanied by a full explanation of the reasons supporting that claim."  *Id.*

As this Court has previously held, an importer under investigation is not entitled to "receive business confidential information" because "Congress has not mandated that

{importers} be afforded such access…" *Royal Brush Mfg., Inc. v. United States*, 483 F. Supp. 3d 1294, 1308 (Ct. Int'l Trade 2020) (*Royal Brush I*).  However, "Customs must ensure compliance with the public summarization requirements provided in" 19 C.F.R. § 164.5.  *Id.*  An importer must thus be provided "notice and a meaningful opportunity to be heard" which, this Court has explained, means "at a meaningful time and in a meaningful manner."  *Royal Brush II*, 545 F. Supp. 3d at 1365 (internal quotations omitted)(citing *Mathews v. Eldridge*, 424 U.S. 319, 333 (1976); *PSC VSMPO-Avisma Corp. v. United States*, 688 F.3d 751, 761–62 (Fed. Cir. 2012)). This is a "fact-based inquiry" that focuses on three factors:

> First, the private interest that will be affected by the official action; second, the risk of an erroneous deprivation of such interest through the procedures used, and the probable value, if any, of additional or substitute procedural safeguards; and finally, the Government's interest, including the function involved and the fiscal and administrative burdens that the additional or substitute procedural requirement would entail.

*Id.,* (quoting *Mathews*, 424 U.S.at 335).

This Court has further explained that "a summary of the bracketed information in sufficient detail to permit a reasonable understanding of the substance of the information, 19 C.F.R. § 165.4(a)(2), provides importers {} an adequate opportunity {} to respond to the evidence used against them…" *Royal Brush II*, 545 F. Supp. 3d at 1367 (cleaned up).  This Court has been clear that an "adequate opportunity" to respond to evidence does not mean specific detail about the bracketed information.  For example, in *Royal Brush II*, the entity under investigation contested public summaries that used descriptors such as "county" "date" and "number" rather than provide the specific information gathered on a site visit.  *Royal Brush II*, 545 F. Supp. 3d at 1356.  But this Court explained that – because CBP is precluded by statute from sharing business confidential information – "the 'substance of the information' in public summaries within the meaning of CBP's regulation must be understood as nevertheless allowing

34

for the protection of the confidential information." *Id.* at 1368.  Thus, the Court found that the

importer's due process rights were unaffected by the undisclosed business confidential

information.  *Id.*

2.  <u>*The Bracketing Permitted By CBP Is In Accordance With Regulation*</u>

As set forth below, CBP required bracketing and public summaries in accordance with its

regulations, and reasonably deferred to M&B and Leco as to what information they consider to

be business confidential, provided sufficient justification was provided.  Importantly, Leco fails

to establish that any of the documents it would have allegedly provided to rebut the confidential

information was outside the scope of CBP's requests for information.  Under this Court's "fact-

based" analysis, Leco has failed to establish that the public summaries provided prevented it

from providing any documents or advancing any arguments that it would have otherwise made.

a)  <u>Allegation Exs. 4 & 7</u>

M&B submitted 34 exhibits in support of its allegation against Leco, requesting

confidential treatment over only two: the foreign market research report it had commissioned, as

well as its calculation of how much equipment Truong Hong would need to employ to produce

the wire hangers allegedly exported from Laos.  C.R. 5 at CR001547-48 (table of contents);

CR001565- 1600 (Exhibit 4); CR001637-48 (Exhibit 7).  In accordance with 19 C.F.R. § 164.5,

M&B provided a public summary for both.  P.R. 5 at 22 (summary of Ex. 4); 60 (summary of

Ex. 7).  Moreover, on remand, M&B provided justification for its request, explaining that:

> This exhibit contains the {foreign market research} report commissioned by
> M&B and contains business confidential information throughout the report.
> Specifically, the {foreign market research} report contains trade secrets of the
> foreign market research firm because it describes in great detail the methods and
> practices of the firm in conducting its investigations as well as the sources of
> information on which its conclusions are based.  Disclosure of the identity of the
> firm or its sources would adversely affect the ability of the firm to continue its
> business and could put employees of the firm and their sources at risk for

35

retaliation or worse.  In addition, disclosure of this information to the public would enable those intent on evading lawful antidumping and/or countervailing duties to take steps that could mask their activities.

R.P.R. 30 at 2.

M&B similarly partially un-bracketed exhibit 7 to its allegation, but explained that the remaining information should be treated as business confidential because "the information in this exhibit is derived from M&B's business confidential commercial operations and M&B's trade secrets regarding the types and capabilities of the equipment which it uses to manufacture steel wire garments." *Id.*

On remand, CBP "determined that M&B provided an adequate explanation requesting business confidential treatment for its documents, as well as certain pages of the narrative in its allegation." ECF No. 37 at 14.  Moreover, CBP explained that "the public versions with public summaries, as well as explanation justifying the continued and revised confidential treatment permitted a reasonable understanding of the underlying substance of the information." *Id.*

Importantly, while M&B requested business confidential treatment over the entire report, the substance of it was discussed in detail in the public allegation document.[8]  P.R. 12.  For example, the public allegation document discusses the following conclusions about Truong Hong's corporate structure and business registration from the foreign market research report:

- "the company was formed in Laos in 2008 by Dung Xuan Toan, a Vietnamese national who is also the current manager/director of Truong Hong."
- The registered address of Truong Hong is Street 13 South, Thaxikay Village, Paksan District, Bolikhamxay Province, Laos.
- "in Laos, Truong Hong has four main business activities, including 'trading services' for 'hangers of clothing exports'—but not production or manufacturing of hangers…"

---

[8]  Indeed, Leco concedes that "much of the information in exhibit 4 is publicly available…"  Pl. Br. at 30.

- "The website of the Truong Hong Group identifies several different member companies, including: 1. Hong Linh JSC (address in Vietnam); 2. Truong Hong Construction (address in Laos); 3. NPK Fertilizer Microbiology Plant (address unknown); 4. Clothes Hanger Factory (address in Laos); 5. Truong Hong Rubber Industry JSC (address in Laos); and 6. A representative office (one in Laos, one in Vietnam)."

*See* P.R. 12 at 4-7.

The public allegation document similarly provided detail about the site visit, including that:

- "The site visit was made to the registered address of Truong Hong in Laos."
- "The sign at the entrance to the location has the previous name of Truong Hong Lao-Viet Joint Stock Company…"
- "This level of production does not support the volume of hangers that are reportedly being shipped by Truong Hong from Laos.  According to Datamyne, Truong Hong was responsible for shipping 376 containers of hangers from Laos to the United States between July 2018 and June 2019—an average of 30 containers per month."
- "the only way that Truong Hong could have shipped 376 containers of hangers to the United States in the past 12 months is if the hangers were being produced somewhere else and transshipped through Laos."

P.R. 12 at 7-8.

And, as M&B's bracketing makes clear, the only information redacted is the sources of the information underlying the allegation, and the specifics of the production capacity as calculated by M&B.  *Id.*

In the same vein, Leco asserts that much of exhibit 7 is public information and therefore should not have been redacted.  Pl. Br. at 33.  But as M&B explained on remand, the crux of the document reveals its "business confidential commercial operations and M&B's trade secrets regarding the types and capabilities of the equipment which it uses to manufacture steel wire garments." R.P.R. 30 at 2.  Without that information, exhibit 7 is merely – as Leco concedes – a list of public information.  Pl. Br. at 32.  Indeed, Leco itself redacted certain documents in full

where "certain portions of the email correspondence did not include confidential commercial information, but those portions 'consist only of the email headers exclusive of the identity of the recipient, and as such provide no substantive information.'"  ECF No. 47 at 16.

Importantly, M&B makes *no argument* as to what information it would have provided had it received all of the information in M&B's report during proceedings before CBP.  Nor does Leco explain why, for example, it could not respond to the assertion that the plant in Laos does not have the capacity to produce the quantity of hangers allegedly exported to the United States when both that conclusion and the total quantity assumed for the purposes of M&B's calculations – and based on public data – were available during proceedings before CBP.

As this Court has explained, "an importer participating in an administrative proceeding has a procedural due process right to 'notice and a meaningful opportunity to be heard.'" *Royal Brush I*, 483 F. Supp. 3d at 1305 (quoting *PSC VSMPO-Avisma*, 688 F.3d at 761–62). However, "as a practical matter" the due process to which an importer is entitled "depends on the circumstances of each case" and is a fact-based inquiry.  *Royal Brush II*, 545 F. Supp. 3d at 1365.  The Court's analysis is fact-based because "due process is flexible and calls for such procedural protections as the particular situation demands."  *Mathews*, 424 U.S. at 334 (citation omitted).  It is thus not sufficient for Leco to assert that a given summary does not meet the requirements of 19 C.F.R. 165.4; it must *also* establish how it was deprived of due process so that the Court may undertake the required "fact-based inquiry."  *Id.*  Having failed to do so, Leco's assertions should be rejected.

2.    Entry Data

Leco similarly argues that its due process rights were violated because CBP did not afford it an opportunity to review other importers' entry data – data which Leco concedes is

"unquestionably the confidential commercial information." Pl. Br. at 39.  Leco thus does not contest the public summaries, but rather CBP's entire regulatory framework – specifically, the lack of a protective order process for proceedings before CBP.  *Id.*  But this Court has previously considered and rejected such an assertion, noting that "EAPA does not require or establish a procedure for the issuance of an administrative protective order {} akin to the procedure used in antidumping and countervailing duty proceedings or otherwise address Customs' management of confidential information." *Royal Brush I*, 483 F. Supp. 3d at 1306.  Indeed, Commerce's protective order process is established *by statute*, whereas the EAPA statute is silent as to a protective order during proceedings before CBP.  *Compare* 19 U.S.C. § 1677f(c)(1)(A)–(B) *with* 19 U.S.C. §1517.

Moreover, while CBP exercised its discretion to consolidate these investigations, it made findings specific *to Leco* based on *Leco's* inability to provide sufficient information to establish the Lao origin of the hangers at issue, in addition to the adverse inference applied against Truong Hong.  *See* C.R. 318.  Once again, absent is *any explanation* as to what additional data Leco would have submitted to rebut other importers' entry data.  Leco asserts that it "could have offered rebuttal information and argument with regard to the fact that whereas Leco's entry data shows the country of export as [        ], in many cases the entries of the other importers listed the country of export as [         ]." Pl. Br. at 39.  But, once again, Leco concedes that such information could not be made publicly available.

Moreover, CBP considered precisely that information, and found that – based on fraudulent documentation and the adverse inference applied against Truong Hong – the entry documents were false.  Leco offers no explanation as to how not having access to data that it concedes is "unquestionably … confidential commercial information" deprived it of its due

process right to "notice and a meaningful opportunity to be heard."  Pl. Br. at 39; *PSC VSMPO-Avisma*, 688 F.3d at 761–62.

   3. <u>Memoranda to File and RAAAS Memorandum</u>

  Though conceding that CBP has now placed public versions of its Memoranda to File and RAAAS memorandum on the record, Leco nevertheless asserts that CBP improperly "continue{s} to redact information that is central to CBP's decision to reject the production documentation submitted by Leco, which has substantially harmed Leco's ability to rebut that conclusion."  Pl. Br. at 33-34.  Central to Leco's assertion is the implication that it was "unable to respond" to CBP's conclusion that the government-issued certifications were fraudulent.  Leco, however, ignores the fact that it was permitted on remand to provide *exactly this information*.  The remand record largely consists of documentation submitted by Leco to contest CBP's determination that the certificates of origin and ASEAN declaration documents were unreliable.  *See generally*, R.C.R. 1-27.  As explained above, CBP considered this documentation but ultimately determined that it did not sufficiently address the irregularities in the documents, particularly in light of CBP's inability to confirm any of the documentation directly with Truong Hong.  And, of course, Leco – now with the benefit of the complete confidential record under the Court's protective order – makes no assertion as to what it would have placed on the record had the information been made public.

  Leco had an opportunity to submit rebuttal information on remand, and CBP reviewed and revised the bracketing to ensure compliance with 19 C.F.R. § 165.4.  Leco fails to establish that CBP violated its regulations or otherwise deprived Leco of a meaningful opportunity to respond, and its assertions should be rejected.

B.    *Leco's Written Argument Was Untimely Filed And CBP Did Not Abuse Its*
      *Discretion In Rejecting It*

Next, Leco asserts that CBP abused its discretion when it declined to accept Leco's

untimely written argument.  Pl. Br. at 46.  Written argument was due to CBP on September 22,

2021; Leco requested, and was granted, and extension to 10:00 am EDT on September 27, 2021.

R.P.R. 106.  Counsel for Leco missed the deadline due to a "calendaring error;" and CBP

declined to accept the late submission.  R.P.R. 107.  Pursuant to regulation, "{i}f a submission is

untimely filed, then CBP will not consider or retain it in the administrative record and adverse

inferences may be applied, if applicable."  19 C.F.R. 165.5(c)(2).

Leco argues that CBP abused its discretion in enforcing the deadline it set.  But CBP's

regulation is clear: while it provides a procedure for requesting an extension, it "will not"

consider late-filed information.  19 C.F.R. § 165.5(c)(2).  Moreover, the cases on which Leco

relies concern the AD/CVD context – administered by the Department of Commerce, and subject

to different statutory and regulatory requirements – and relate to circumstances where an adverse

inference was applied against a party because a filing was untimely.  For example, in *Celik Halat*

*v. Tel Sanayi A.S.,* the Court found that Commerce abused its discretion when it declined to

consider a late submission *and* used the lack of response as the basis for the application of an

adverse inference.  557 F. Supp. 3d 1363, 1379 (Ct. Int'l Trade 2022).  Here, CBP accepted and

considered the significant rebuttal documentation submitted by Leco, as well as Leco's

comments on the draft remand redetermination.  And, of course, CBP did not apply an adverse

inference against Leco when its written submission was untimely.  CBP, under a short turn-

around that it was already struggling to meet (evidenced by the fact that it ended up requesting a

short extension from this Court, ECF No. 43) did not abuse its discretion in declining to accept

Leco's submission.

C.     *CBP's Determination To Initiate An Investigation Is Not Subject To Judicial Review, And, In Any Event, Was Reasonable*

Leco next asserts that CBP's entire determination must be "vacated" because the information that M&B submitted in support of its allegation contains "deficiencies…such that it was not reasonable for CBP to rely on any of the information contained therein." Pl. Mot. at 11-12. As an initial matter, the scope of this Court's review of an EAPA determination is expressly limited by statute; 19 U.S.C. § 1517 provides that an interested party "may seek judicial review of the determination under subsection (c) and the review under subsection (f) in the United States Court of International Trade to determine whether the determination and review is conducted in accordance with subsections (c) and (f)." 19 U.S.C. § 1517(g)(1). Subsections (c) and (f) of the statue concern CBP's actual determination – directing that it be based on "substantial evidence" – and the internal *de novo* review that importers are permitted to request. *Id.* at §§ (c)(1)(A); (f).

It is axiomatic that a party may only bring suit against the Government to the extent it has waived sovereign immunity. *Library of Congress v. Shaw*, 478 U.S. 310, 315 (1986) ("As sovereign, the United States, in the absence of its consent, is immune from suit.") (citation omitted); *see also FAA v. Cooper*, 566 U.S. 284, 290 (2012) ("We have said on many occasions that a waiver of sovereign immunity must be 'unequivocally expressed' in statutory text."). Sidestepping this legal principle, Leco contests CBP's determination to open an investigation, which it concedes arises under § 1517(b)(1). Pl. Br. at 11. Despite quoting the statutory language limiting this Court's review to the actual determination made – rather than the decision to open an investigation – Leco offers *no* legal argument that this Court can consider its contentions. Pl. Br. at 9, 11-13. But the statute's language is clear: this Court's scope of review does not extend to CBP's determination that an allegation merits the initiation of an investigation. And this is consistent with the broader Administrative Procedure Act, which does

not permit judicial review of an agency's determination to initiate an investigation into alleged misconduct.  *See, e.g., Gentile v. Sec. & Exch. Comm'n*, 974 F.3d 311, 318 (3d Cir. 2020) (affirming district court decision that it did not possess jurisdiction to review the SEC's initiation of an investigation into a day-trading firm).

Moreover, even if this Court did possess jurisdiction to consider CBP's decision to initiate an investigation, CBP's decision was reasonable.  Specifically, CBP received a detailed allegation from M&B relying on both public CBP data, as well as information gathered in its own investigation.  C.R. 1-20.  M&B's allegation explained its belief that dumping was likely, based on CBP data: 487 million wire hangers were imported from Vietnam in 2012 and nearly 1 billion from China in 2013, yet – after the AD/CVD orders were instituted – imports dropped to 26 million from China and only 2 million from Vietnam by 2018.  C.R. 14 at CR003949.  At the same time, imports from Laos skyrocketed to 266 million.  *Id.*  In addition to this, M&B submitted a report by a foreign market researcher, including research into Truong Hong's corporate structure and history, as well as a site visit and interview with employees.  *Id.*  The information submitted described ties between Truong Hong and Vietnam – including ownership by Vietnamese nationals and member companies based in Vietnam.  *Id.* at CR003950-51.  M&B further asserted that information received from the [                                    ] indicated that one of Truong Hong's registered business activities was "trading services (hangers of clothing exports)" but *not* the production of wire hangers.  *Id.*  To this, M&B added a report of a site visit that it privately commissioned, which asserted that

[




]

C.R. 14 at CR003952, summarizing C.R. 5 at CR001565-1600.

CBP determined that this and the other information presented by M&B, "reasonably suggests" that evasion might have occurred, and opened an investigation. 19 U.S.C. § 1517(b)(1). Even if that decision were subject to judicial review, it was reasonable.

Leco ignores the substance of M&B's allegations, instead arguing that the allegations should have been rejected outright because the market report is "unsigned" and the date on the cover page does not indicate when the underlying information was gathered, "nor even a rough time period for the fact-gathering actions described." Pl Br. at 12. Leco further complains that the report provided no basis to initiate an investigation because the market researcher [


                                         ] Pl. Br. at 12. Setting aside the absurdity (not to mention danger) in requiring a private party to announce to a company that it is drafting a report for the purposes of making an allegation to CBP, Truong Hong had the opportunity provide narrative explanation and documentation to rebut M&B's allegations during CBP's investigation; it failed to do so. C.R. 67 (RFI to Truong Hong).

Leco essentially argues that CBP cannot accept an allegation as true for the purposes of deciding whether to open an investigation, but instead must somehow verify the information in the allegation *before* investigating it. The circular nature of Leco's argument exposes its absurdity: how could CBP determine that an allegation is factually accurate *without* opening an investigation? Even if CBP's decision to open an investigation were subject to judicial review – which it is not – the information submitted by M&B "reasonably suggests" the evasion may have occurred, and CBP's determination to open an investigation was reasonable.

D.     *The Statue Contemplates Consolidation Of Related Investigations*

Finally, Leco asserts – in a single paragraph, with no citation to legal authority – that CBP acted in an arbitrary and capricious manner when it did not consider Leco separately from the other nine entities also alleged to have bought Vietnam-produced wire hangers from Truong Hong.  Pl. Br. at 25.  But the statue specifically contemplates CBP consolidating multiple allegations "into a single investigation if the Commissioner deems it appropriate to do so."  19 U.S.C. § 1517(b)(5)(A) ("The Commissioner may consolidate multiple allegations described in paragraph (2) and referrals described in paragraph (3) into a single investigation if the Commissioner determines it is appropriate to do so.")  As with the determination to commence an investigation, the determination to combine related allegations into a single investigation arises under section 1517(b) and thus is not subject to judicial review.  19 U.S.C. § 1517(g)(1).  Moreover, even if the decision to consolidate investigations *were* subject to judicial review, the factual overlap in the allegations lodged against all ten importers – including, most importantly, the *same* alleged manufacturer and exporter – more than justifies CBP's determination to do so.  *See* C.R. 11-20 (M&B making substantially similar allegations about all ten importers).

## CONCLUSION

For these reasons, we respectfully request that the Court deny plaintiff's motion, and sustain CBP's evasion determination.

Respectfully submitted,

BRIAN M. BOYNTON
Principal Deputy Assistant Attorney General

/s/ Patricia M. McCarthy
PATRICIA M. MCCARTHY
Director

OF COUNSEL:                          /s/ Kelly A. Krystyniak
JENNIFER L. PETELLE                  KELLY A. KRYSTYNIAK
Attorney                             Trial Attorney
U.S. Customs and Border Protection   Department of Justice
Office of the Chief Counsel          Civil Division
                                     Commercial Litigation Branch
                                     P.O. Box 480
                                     Ben Franklin Station
                                     Washington D.C. 20044
                                     Tel: (202) 307-1063
                                     Email: kelly.a.krystyniak@usdoj.gov

May 20, 2022                         *Attorneys for Defendant United States*

## **CERTIFICATE OF COMPLIANCE**

Pursuant to Rule 2(b) of the Court's Standard Chambers Procedures, defendant's counsel

certifies that this brief complies with the Court's type-volume limitation rules.  According to the

word count calculated by the word processing system with which the brief was prepared, the

portions of this brief subject to the word count limitation contains a total of 13,734 words.

<u>s/ Kelly A. Krystyniak</u>

May 20, 2022

## UNITED STATES COURT OF INTERNATIONAL TRADE

**BEFORE:     THE HONORABLE MARK A. BARNETT, CHIEF JUDGE**

| | |
|---|---|
| LECO SUPPLY, INC., | |
| Plaintiff, | |
| v. | |
| UNITED STATES, | Consol. Court No. 21-00136 |
| Defendant, | |
| and | |
| M&B METAL PRODUCTS CO., | |
| Defendant-Intervenor. | |

<u>ORDER</u>

Upon consideration of plaintiff's motion for judgment upon the agency record, defendant and defendant-intervenor's responses, plaintiff's reply, and all other pertinent papers, it is hereby

ORDERED that plaintiff's motion for judgment upon the administrative record is denied and it is further;

ORDERED that the final determination of U.S. Customs and Border Protection is sustained, and it is further

ORDERED that final judgment shall enter in favor of the United States.

_____
CHIEF JUDGE

Dated: _____
New York, New York