Slip Op. 23-8

# UNITED STATES COURT OF INTERNATIONAL TRADE

|  |  |
|---|---|
| LECO SUPPLY, INC., <br><br> Plaintiff, <br><br> v. <br><br> UNITED STATES, <br><br> Defendant, <br><br> and <br><br> M&B METAL PRODUCTS CO., INC. <br><br> Defendant-Intervenor. | Before: Mark A. Barnett, Chief Judge <br> Court No. 21-00136 <br><br> **PUBLIC VERSION** |

## <u>OPINION</u>

[Sustaining U.S. Customs and Border Protection's affirmative determination of evasion in EAPA Consolidated Case No. 7357, as amended by the remand redetermination.]

Dated: January 24, 2023

<u>Heather Jacobson</u>, Junker & Nakachi P.C., of Seattle, WA, argued for Plaintiff.

<u>Kelly A. Krystyniak</u>, Trial Attorney, Commercial Litigation Branch, Civil Division, U.S. Department of Justice, of Washington, DC, argued for Defendant.  With her on the brief were <u>Brian M. Boynton</u>, Principal Deputy Assistant Attorney General, and <u>Patricia M. McCarthy</u>, Director.  Of counsel on the brief was <u>Jennifer L. Petelle</u>, Attorney, Office of the Chief Counsel, U.S. Customs and Border Protection.

<u>Kimberly R. Young</u>, Vorys, Sater, Seymour and Pease LLP, of Washington, DC, argued for Defendant-Intervenor.  With her on the brief was <u>Frederick P. Waite</u>.

Barnett, Chief Judge:  This matter is before the court on U.S. Customs and

Border Protection's ("CBP" or "the agency") first remand redetermination in connection

with EAPA Consolidated Case No. 7357.  *See* Remand Redetermination ("Remand

Results"), ECF No. 47.[1]  CBP issued the Remand Results pursuant to the court's

remand order.  Order (Aug. 3, 2021) ("Remand Order"), ECF No. 42.  The Remand

Results concern CBP's affirmative determination of evasion of the antidumping and

countervailing duty orders on certain steel wire garment hangers from the Socialist

Republic of Vietnam ("Vietnam").  *Id.* at 2; *see also* Confid. Notice of Determination as

to Evasion, EAPA Case No. 7357 (Oct. 26, 2020) ("Evasion Determination"), ECF No.

22-2; Letter Re: Enforce and Protect Act ("EAPA") Consol. Case No. 7357 (Feb. 24,

2021) ("Admin. Review"), ECF No. 19-3.  CBP issued its evasion determination

pursuant to its authority under the Enforce and Protect Act ("EAPA"), 19 U.S.C. § 1517

(2018).[2]

---

[1] The administrative record for the Remand Results is contained in a Confidential Remand Record ("CRR"), ECF Nos. 48-1 (CRR 1–27) and 48-2 (CRR 28–45), and a Public Remand Record ("PRR"), ECF Nos. 49-1 (PRR 1–25), 49-2 (PRR 26–78) and 49-3 (PRR 79–117).  An index of the administrative record for CBP's final evasion determination was also filed with the court.  Business Confid. Index ("CR"), ECF No. 22-1; Public Doc. Index ("PR"), ECF No. 19-1.  Plaintiff filed joint appendices containing record documents cited in parties' briefs.  *See* Confid. J.A. ("CJA"), ECF Nos. 65–1 (Tabs 1–56), 65-2 (Tabs 57–59), 65-3 (Tab 60 part 1), 65-4 (Tab 60 part 2), 65-5 (Tab 60 part 3), 65-6 (Tab 60 part 4), 65-7 (Tabs 61–85), and 65-8 (Tabs 86–103); Public J.A. ("PJA"), ECF Nos. 66-1 (Tabs 1–39), 66-2 (Tabs 40–91), and 66-3 (Tabs 92–103). The CJA and PJA contain documents from both the administrative record for CBP's final evasion determination and the administrative record for the Remand Results.  The court references the confidential version of the record documents, unless otherwise specified.

[2] "Evasion" is defined as "entering covered merchandise into the customs territory of the United States by means of any document or electronically transmitted data or information, written or oral statement, or act that is material and false, or any omission that is material, and that results in any cash deposit or other security or any amount of applicable antidumping or countervailing duties being reduced or not being applied with respect to the merchandise."  19 U.S.C. § 1517(a)(5)(A).  Congress enacted EAPA as part of the Trade Facilitation and Trade Enforcement Act of 2015, Pub. L. No. 114–125, § 421, 130 Stat. 122, 161 (2016).

Plaintiff Leco Supply, Inc. ("Leco") opposes the Remand Results.  Confid. Pl.

[Leco's] Mem. in Supp. of its Mot. for J. on the Agency R. ("Pl.'s Mem."),[3] ECF No. 52;

Confid. Pl. [Leco's] Reply to Def. Resp. to Mot. for J. on the Agency R. ("Pl.'s Reply"),

ECF No. 63.  Defendant United States ("the Government") responded in support of the

Remand Results.[4]  Confid. Def.'s Resp. to Pl.'s Mot. for J. on the Agency R. ("Def.'s

Resp."), ECF No. 60.

Leco raises four challenges to CBP's evasion determination.  Leco argues that

(1) CBP improperly initiated the EAPA investigation, Pl.'s Mem. at 10–13; (2) CBP's

evasion determination was not supported by substantial evidence, *id*. at 13–26; (3) CBP

denied Leco procedural due process and redacted material evidence in violation of

CBP's regulations, *id*. at 26–46; and (4) CBP's refusal to accept Leco's written

arguments during the remand proceeding was an abuse of discretion, *id*. at 46–47.  For

the following reasons, the court sustains CBP's final evasion determination, as

amended by the Remand Results.

### JURISDICTION AND STANDARD OF REVIEW

The court has jurisdiction pursuant to section 517(g) of the Tariff Act of 1930, as

amended, 19 U.S.C. § 1517(g) (2018), and 28 U.S.C. § 1581(c) (2018).  EAPA directs

---

[3] Although the case is before the court on remand, Leco fashioned its response as a motion for judgment on the agency record consistent with the court's Remand Order, recognizing that the results of the administrative review were remanded to CBP before Leco had the opportunity to brief the merits of its case.  *See* Remand Order.
[4] Defendant-Intervenor M&B Metal Products Co., Inc. ("M&B") filed a letter in lieu of a brief indicating its support for the Government's position and urging the court to sustain the Remand Results.  *See* Letter in Lieu of a Br., ECF No. 62.

the court to determine whether a determination issued pursuant to 19 U.S.C. § 1517(c) or an administrative review issued pursuant to 19 U.S.C. § 1517(f) was "conducted in accordance with those subsections."  19 U.S.C. § 1517(g)(2).  In so doing, the court "shall examine . . . whether [CBP] fully complied with all procedures under subsections (c) and (f)" and "whether any determination, finding, or conclusion is arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law."  *Id*.

"The scope of review under the 'arbitrary and capricious' standard is narrow and a court is not to substitute its judgment for that of the agency."  *Motor Vehicle Mfrs. Ass'n of U.S., Inc. v. State Farm Mut. Auto. Ins. Co.*, 463 U.S. 29, 43 (1983).  However, CBP "must examine the relevant data and articulate a satisfactory explanation for its action[,] including a 'rational connection between the facts found and the choice made.'" *Id*. (quoting *Burlington Truck Lines v. United States*, 371 U.S. 156, 168 (1962)).  "An abuse of discretion occurs [when] the decision is based on an erroneous interpretation of the law, on factual findings that are not supported by substantial evidence, or represents an unreasonable judgment in weighing relevant factors."  *Consol. Bearings Co. v. United States*, 412 F.3d 1266, 1269 (Fed. Cir. 2005) (citation omitted).  "Courts look for a reasoned analysis or explanation for an agency's decision as a way to determine whether a particular decision is arbitrary, capricious, or an abuse of discretion."  *Wheatland Tube Co. v. United States*, 161 F.3d 1365, 1369 (Fed. Cir. 1998).

### BACKGROUND

Leco is a domestic importer of metal wire hangers purportedly manufactured by Truong Hong Development Multidisciplinary Group Ltd. ("Truong Hong"), a Lao company.  *See* Compl. ¶¶ 4, 11, ECF No. 2.  On October 2, 2019, M&B, a domestic producer of metal wire hangers, lodged an allegation with CBP in which it averred that Leco and nine other importers entered hangers that had been manufactured in Vietnam and transshipped through Laos in violation of antidumping ("AD") order A-552-812 and countervailing duty ("CVD") order C-552-813 (together, the "AD/CVD Orders") on hangers from Vietnam.  *See* Compl. ¶ 8; Def.'s Resp. at 2–3.  In support of its allegations, M&B provided a report prepared by a foreign market researcher ("Market Research Report"), which concluded that the Truong Hong factory in Laos did not have the capacity to produce the volume of hangers allegedly imported from Truong Hong. EAPA Duty Evasion Allegation Concerning Steel Wire Garment Hangers Imported from Laos—Importer: Leco Supply (Oct. 2, 2019) ("Allegation Narrative")[5] at 7, CR 14, PR 12, CJA Tab 3.  M&B also cited changes in metal hanger production trends reflecting a significant decrease in hanger production in Vietnam and corresponding increases in Laos and China.  *Id.* at 4.  In response to these allegations, on October 25, 2019, CBP initiated EAPA investigations into imports by Leco and the nine other importers identified in M&B's submissions.  Notice of Initiation of Investigation and Interim

---

[5] The public version of the Allegation Narrative contained in the PJA is referred to herein as the "Public Allegation Narrative."  *See* Public Allegation Narrative, CR 14, PR 12, PJA Tab 3.

Measures Taken (Jan. 30, 2020) ("Initiation Notice") at 3, available at

https://www.cbp.gov/sites/default/files/assets/documents/2020-

Mar/EAPAInvestigation%207357%20%28508%20compliant%29.pdf (last visited Jan.

24, 2023).[6]  On January 30, 2020, CBP consolidated its investigations of all ten

importers into EAPA Consolidated Case No. 7357.  *Id.* at 12.

Pursuant to 19 C.F.R. § 165.5, CBP sent requests for information ("RFI(s)") to

Leco and the other importers requesting information about their import policies and

procedures, purchase and sales records for the hangers, and corporate structure.

Evasion Determination at 3.  CBP also sent an RFI to Truong Hong requesting

information about its manufacturing process for hangers, including detailed production

capabilities and capacities; the sources of its raw materials; its corporate structure and

affiliations; and the source of any finished hangers not produced on-site.  *Id.* at 3–4.

Truong Hong failed to provide a substantive response to the RFI.  *Id.* at 5.

On October 26, 2020, CBP issued an affirmative determination as to evasion.  *Id.*

at 1.  CBP found that "substantial evidence exist[ed] demonstrating that the Importers

misrepresented the country of origin on their imports of hangers" and that "[e]vidence on

the record strongly suggest[ed] that a Truong Hong [[          ]] in Vietnam actually

manufactured the hangers."  *Id.* at 11.  CBP explained that, despite having requested

and received multiple extensions from CBP, Truong Hong failed to provide a

_____

[6] The confidential version of the Initiation Notice was also filed, *see* Confid. Notice of
Initiation of Investigation and Interim Measures Taken (Jan. 30, 2020), CRR 42, PRR
97, CJA Tab 31, but the version filed in the CJA only contained the first three pages of
the confidential document.

substantive response to the RFI.  *Id*. at 5.  Based on CBP's finding that Truong Hong

failed to cooperate with the EAPA investigation to the best of its ability, CBP determined

to use facts available with an adverse inference.  *Id*. at 10–11.

On November 24, 2020, Leco requested an administrative review of the Evasion

Determination.  Req. for Admin. Review of Evasion Determination (Nov. 25, 2020), CR

319, PR 476, CJA Tab 89.  In the subsequent decision, CBP explained that the

questionable authenticity of the documentation submitted by Leco and other importers,

coupled with evidence of significant ties between Truong Hong and DNA Investment

Joint Stock Company ("DNA"), a Vietnamese company subject to the AD/CVD Orders,

supported a finding that the hangers imported by Leco during the period of investigation

were manufactured in Vietnam.  Admin. Review at 9–11.

In the Administrative Review, CBP specifically addressed several issues relevant

to this litigation.  First, CBP found that Truong Hong's receipts for its purchased raw

materials and packaging materials appeared to be self-generated because they were

printed on Truong Hong's own letterhead.  *Id*. at 9.  CBP also determined that the

record did not support a finding that Truong Hong could produce the volume of wire

hangers that it exported to the United States during the period of investigation.  *Id*. at

10.  Specifically, the importers being investigated submitted inconsistent quantities of

machines and employees employed by Truong Hong and the production capacity

reports appeared to have been created by Truong Hong because most were printed on

Truong Hong's letterhead.  *Id*.  Furthermore, the only other evidence of production

capacity was "some poor quality photos" allegedly taken in 2013 and 2014, and eleven

undated photographs provided by Truong Hong through the importers.  *Id*.  Finally, CBP

discussed Truong Hong's ties to DNA.  *Id*.  CBP noted that (1) Truong Hong's registered

business address is in Vietnam; and (2) many of the individuals representing Truong

Hong in communications with the importers were also involved in the operations of DNA

and did not appear on Truong Hong's employee list.  *Id*.  CBP also noted that Leco did

not visit the factory in Laos to verify production, but that Leco's General Manager did

meet with Truong Hong representatives in Vietnam.  *Id*. at 10–11.  CBP also determined

that the record did not support the application of adverse inferences as to Leco because

Leco had timely responded to all CBP requests and provided "a significant amount of

documentation and full responses" to the RFIs.  *Id*. at 11.

Leco timely sought judicial review of CBP's determination pursuant to 19 U.S.C.

§ 1517(g).  *See* Summons, ECF No. 1; Compl.  The Government requested a remand

to consider certain documents inadvertently omitted from the administrative review of

the Evasion Determination and to consider allegations in the complaint regarding CBP's

compliance with its regulations concerning business proprietary information and public

summaries of such information.  *See* Def.'s Mot. for Voluntary Remand and to Suspend

the Current Briefing Schedule, ECF No. 39.  The court granted the Government's

remand request.  *See* Remand Order.

CBP issued its remand determination on November 10, 2021.  *See* Remand

Results at 1.  On remand, CBP again found that its affirmative evasion determination

was supported by substantial evidence.  *See id*. at 6–7.

During the remand, CBP requested that Leco and M&B review previously submitted business confidential documents and justify why any bracketed information consisted of statutorily protected trade secrets and confidential or commercial information.  *Id*. at 9.  CBP invited parties to submit rebuttal information and arguments relevant to any revised public documents.  *Id*.  CBP granted Leco a partial extension for its written arguments; however, Leco failed to timely submit its written arguments and CBP rejected the submission.  *Id*. at 11–12.

DISCUSSION

**I.    CBP's Initiation of EAPA Investigation**

      **A.  Parties' Contentions**

Leco contends that CBP should not have initiated an EAPA investigation because the evasion allegation did not reasonably suggest that evasion had occurred. *See* Pl.'s Mem. at 10–13.  Leco argues that CBP should have rejected the Market Research Report as non-credible, *id*. at 12, and that it was unreasonable for CBP to accept the production capacity estimates provided in the allegation because there was no explanation as to how they were calculated.  *Id*. at 13.

The Government argues that CBP's determination to initiate an investigation was reasonable.[7]  Def.'s Resp. at 43–44.[8]

### B.  Analysis

Pursuant to 19 U.S.C. § 1517(b)(1), CBP "shall initiate an investigation if [CBP] determines that the information provided in the allegation . . . reasonably suggests that covered merchandise has been entered into the customs territory of the United States through evasion."  *See also* 19 C.F.R. § 165.15 (requiring CBP to initiate an investigation if an allegation "reasonably suggests" the occurrence of evasion).  CBP's

---

[7] While the Government frames CBP's determination as "reasonable," the standard of review for CBP's EAPA determinations is whether such determinations are "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law" and whether CBP "fully complied with all procedures" in making such determinations.  19 U.S.C. § 1517(g)(2).

[8] The Government also contends that CBP's determination to initiate an investigation is not subject to judicial review.  Def.'s Resp. at 42–43.  The Government asserts that because 19 U.S.C. § 1517 limits judicial review to determinations made under subsection 1517(c) and administrative reviews made under subsection 1517(f), *see* 19 U.S.C. § 1517(g)(1), the United States has not waived its sovereign immunity with respect to challenges to CBP's initiation of EAPA investigations, Def.'s Resp. at 42–43. However, in the context of agency proceedings, interlocutory decisions made by the agency, such as determinations to initiate an investigation, may be subsumed by a final determination that is subject to judicial review.  *See, e.g., M S Int'l, Inc. v. United States*, 44 CIT __, __, 425 F. Supp. 3d 1332, 1337 (2020) (plaintiff could only challenge the U.S. Department of Commerce's ("Commerce") initiation determination after the agency reached a final determination in the investigations); *Gov't of People's Republic of China v. United States*, 31 CIT 451, 459, 483 F. Supp. 2d 1274, 1281 (2007) (plaintiff could challenge agency authority to initiate a countervailing duty investigation at the conclusion of the investigation); *Hilsea Inv. Ltd. v. Brown*, 18 CIT 1068, 1071 (1994) (interlocutory decisions may be subsumed in a final agency determination).

determination that M&B's allegation reasonably suggested evasion is not arbitrary,

capricious, an abuse of discretion, or otherwise not in accordance with law.[9]

As CBP explained in the Initiation Notice, the allegation contained information

indicating that Truong Hong did not have enough employees or hanger forming

machines to produce hangers in the quantity that Truong Hong was responsible for

shipping.  Initiation Notice at 4.  Furthermore, the allegation contained trade data

indicating that, following the imposition of the AD/CVD Orders, shipments of hangers

from Vietnam decreased significantly while imports from Laos increased significantly,

suggesting that wire hangers imported from Laos were transshipped to avoid the

applicable antidumping and countervailing duties.  *Id*. at 4–5.  In short, the information

provided in the allegation is adequate to support CBP's decision to initiate the EAPA

investigation.

---

[9] At oral argument, the court asked whether Leco had exhausted its administrative remedies with respect to challenging CBP's initiation of an investigation.  Oral Arg. at 03:02–03:16 (time stamp from the recording on file with the court).  Leco explained that it did not raise this argument during the initial investigation because the specifics of the basis for initiating the investigation were not available to Leco.  *Id*. at 3:40–4:30.  The court agrees that Leco could not have raised this argument at the administrative level because the redactions to the allegation and supporting documents limited Leco's ability to assess whether the allegation "reasonably suggested" that evasion was occurring. *See generally* Initiation of Investigation for EAPA Case No. 7370 – Leco Supply (Oct. 25, 2019), CR 54, PR 57, PJA Tab 17 (public version of CBP's explanation for initiating an investigation as to Leco); *see also* Public Allegation Narrative Exs. ("Public Allegation Exs."), Ex. 4, Ex. 7, CRR 28, PRR 79, PJA Tab 2.

II.   **Whether CBP's Determination of Evasion is Supported by Substantial Evidence, and is not Arbitrary, Capricious, an Abuse of Discretion or Otherwise not in Accordance with Law**

  A. **Parties' Contentions**

Leco argues that CBP's determination that Truong Hong lacked the capacity to produce the wire hangers it exported is not supported by substantial evidence and that, instead, substantial evidence supports the conclusion that Leco's imported wire hangers were produced in Laos.  See Pl.'s Mem. at 14–24. Leco further contends that the relationship between Truong Hong and DNA does not support a finding of evasion.  *See id.* at 25–26.

The Government contends that substantial evidence supports CBP's evasion determination, and that Leco simply disagrees with how CBP weighed and considered record evidence.  Def.'s Resp. at 22.

  B. **Analysis**

Leco contends that CBP's evasion determination was arbitrary and capricious because the agency ignored or purportedly rejected record evidence "without justification."  Pl.'s Mem. at 14.  Leco maintains that record documents demonstrated that Truong Hong had the capacity to produce approximately 20,217,600 wire hangers per month,[10] an amount greater than the total number of hangers imported by the

---

[10] Leco claims that record documents indicate that Truong Hong had the production capacity to make 32,400 wire hangers per hour and that Truong Hong's factory could operate at full capacity twenty-four hours per day, six days per week, resulting in a monthly production capacity of approximately 20,217,600 hangers.  Pl.'s Mem. at 14–15.

importers under review in the months Leco's hangers were entered and the months

immediately prior thereto.  *See id*. at 14–15.  Leco contends that "no credible record

evidence . . . refutes or contradicts" those production capacity calculations because

CBP did not [[                        ]] or identify any information indicating that production

levels are contrary to those submitted by importers.  *Id*. at 16.

To support its argument, Leco relies on record documents that Truong Hong

provided to the investigated importers and those importers submitted to CBP.  *See*

Summary of Factual Info. Regarding Enforce and Protect (EAPA) Consolidated Case

7357 (Sept. 16, 2020) ("RAAAS Mem.") at 14–16, CRR 35, PRR 87, CJA Tab 86.  CBP,

however, determined that these production capacity documents were unreliable.  *See*

Evasion Determination at 8 ("[B]ecause Truong Hong failed to respond to the RFI, any

documentation purported to be from Truong Hong and submitted by [the importers

subject to the investigation] shall be deemed unreliable."); Admin. Review at 10

("[I]mporters did not provide consistent numbers of machinery and numbers of

employees to indicate production capacity."); Remand Results at 21 ("[R]ebuttal

information that Leco submitted on remand to support its assertion that the foreign

manufacturer was capable of producing the number of hangers in Laos that it actually

exported was insufficient to support a reversal of the determination of evasion.").

As explained in the RAAAS Memorandum, the information submitted by the

importers regarding Truong Hong's production capacity was inconsistent.  RAAAS

Mem. at 16.  Because Truong Hong failed to respond to the RFI, CBP was unable to

verify the accuracy of this conflicting information.  *See* Evasion Determination at 8–10;

Remand Results at 21.  Substantial evidence supports CBP's determination that record documents purporting to show Truong Hong's production capacity were unreliable because they were inconsistent and, absent Truong Hong's participation, CBP was unable to obtain consistent, accurate capacity information.

Leco also challenges CBP's "rejection" of production documentation submitted by Leco as arbitrary and capricious.  Pl.'s Mem. at 17.  Leco submitted an array of documents, including alleged certificates of origin, ASEAN Customs Declarations, trucking records, raw material purchase records, and payment records, purporting to support a finding that its imported hangers were produced in Laos.  *See* Pl.'s Mem. at 17; Remand Results at 32–33.  CBP did not reject the documents as Leco argues. Instead, three separate times, CBP explained why it found these documents to be unreliable.  *See* Evasion Determination at 8–9; Admin. Review at 9–10; Remand Results at 32–37.

With respect to the certificates of origin, CBP found that the numbers on these certificates appeared to have been made using a numbering stamp—which could simplify the act of counterfeiting—leading CBP to question whether the certificates were counterfeit.  *See* Remand Results at 32.  CBP's determination that the certificates of origin were unreliable is further bolstered by the fact that [[                                    ]] informed CBP that it did not issue any [[                         ]] to Truong Hong.  Evasion Determination at 3.

CBP similarly explained that it found the ASEAN Customs Declarations, purporting to show Truong Hong's purchase and importation of certain input material, to

be unreliable.  Remand Results at 32–33.  CBP's suspicions as to the ASEAN Customs

Declarations were confirmed by [[                                        ]].  *See* Evasion

Determination at 8.  Moreover, CBP explained that the declarations were either not

completed or were completed incorrectly, Remand Results at 32–33; *see also* RAAAS

Mem. at 19–22 (noting that multiple declarations contained an incorrect harmonized

tariff number), and were suspicious because "all ASEAN Customs Declarations were

[[                              ]]," and these were not, RAAAS Mem. at 19.  Additionally, for

inputs from China, CBP questioned the legitimacy of corresponding ASEAN documents

because China was not a party to ASEAN.  Evasion Determination at 8.  CBP rejected

Leco's characterization of these mistakes as "minor errors" based on the record as a

whole and the absence of evidence that Truong Hong paid the value-added taxes

identified on the ASEAN Customs Declarations.  Remand Results at 33.

     CBP also provided a reasoned explanation as to why it found trucking and

payment records submitted by Leco to be unreliable.  CBP noted that the truck bills "did

not include invoice numbers" and that it was unusual that the truck bills were in English

instead of Vietnamese or Laotian and "included an unusual mixture of font types."

RAAAS Mem. at 19.  CBP explained that the payment records were written in English

and some forms lacked relevant information such as the SWIFT code, beneficiary

address, and reference number or any other unique identifier, and it appeared that

certain stamps were placed on the forms before the forms had been filled out, leading

CBP to conclude that they "appeared to be counterfeits."  *See* Remand Results at 35–

36; *see also* RAAAS Mem. at 19–20.[11]  Furthermore, CBP noted that neither Leco nor

any of the other importers provided bank statements or wire transfer receipts to support

Truong Hong's alleged payments for transportation services.  *See* Remand Results at

35–36; RAAAS Mem. at 19–20.

Leco argues that CBP's rejection of production documentation submitted by Leco

based on Truong Hong's failure to participate in the investigation "amounts to

application of adverse inferences."  Pl.'s Mem. at 25.  This argument is without merit.

CBP did not apply adverse inferences with respect to Leco.  *See* Admin. Review at 11.

Although CBP noted that Truong Hong's failure to participate made it difficult to confirm

whether the information provided by Leco and other importers was accurate, *see*

Evasion Determination at 8–9; Remand Results, Addendum at 4, Truong Hong's failure

to respond was not the only reason CBP found the documentation submitted by Leco to

be unreliable.  The documents submitted by the importers contained inconsistencies

regarding production capabilities; and the certificates of origin, ASEAN Customs

---

[11] At oral argument, Leco argued that CBP's reasons for not relying on the payment records generally (such as the absence of SWIFT codes and other reference information) did not apply to the documents that Leco supplied.  Oral Arg. at 25:05–25:40, 27:38–28:50.  Leco subsequently filed the referenced documents with the court. *See* Confid. Resp. to Ct.'s Req. for Docs., ECF Nos. 70–1 through 70–4.  Leco argued that these documents trace the importation of raw materials for use in production of the wire hangers in Laos.  Oral Arg. at 1:20:10–1:21:51.  While some of these documents do appear to be related on their face, *see* ECF No. 70–3 at CR008207–08, the connection between others is not apparent on its face.  Regardless, any "traceability" within these documents does not rebut CBP's conclusion that the documents appeared to be counterfeits because they were completed in English and the forms had been stamped before they were filled out.  *See* Remand Results at 35–36; RAAAS Mem. at 19–20.

Declarations, and trucking and payment records appeared, on their face, to be

counterfeit.  *See* Remand Results at 32–37.  CBP relied on these multiple

inconsistencies to find that the documents were unreliable—not on Truong Hong's

failure to respond to the RFI.

Leco next contends that because CBP and M&B conceded that Truong Hong

had the capacity to produce enough hangers to meet Leco's total import volume during

the period of investigation, substantial evidence cannot support CBP's evasion

determination.  *See* Pl.'s Mem. at 17.  This argument is unpersuasive.  Interested

parties, including both foreign producers and importers, bear the burden to provide

sufficient evidence of production capabilities.  *Cf. Rhone Poulenc, Inc. v. United States*,

899 F.2d 1185, 1190–91 (Fed. Cir. 1990) (placing "the burden of production on the

[party] which has in its possession the information capable of rebutting the agency's

inference"); *Royal Brush Mfg., Inc. v. United States* ("*Royal Brush II*"), 45 CIT __, __,

545 F. Supp. 3d 1357, 1373 (2021) ("[I]nterested parties bear the burden of supplying

[CBP] with accurate information that withstands verification.").  Here, both Leco and

Truong Hong failed to provide evidence that the merchandise imported by Leco was

produced in Laos.  *See* Remand Results at 38.  The fact that Truong Hong *theoretically*

could have produced the wire hangers that Leco imported is inconclusive as to whether

it *actually* did.  *See Royal Brush II*, 545 F. Supp. 3d at 1373 (rejecting importer's

suggestion that "CBP was required to assume that its pencils were among the orders

that the [alleged manufacturer] had the capacity to produce").

Leco also contends that record evidence differs significantly between Leco and the other nine importers subject to the investigation and, as such, Leco should be considered distinct from the other importers.  *See* Pl.'s Mem. at 25.  The Government treats the issue as one of consolidation,[12] contending that the factual overlap in the allegations against all the subject importers, including the use of the same alleged manufacturer and exporter, justified CBP's determination to consolidate the investigations.[13]  *See* Def.'s Resp. at 45.

CBP "may consolidate multiple allegations . . . into a single investigation if [CBP] determines it is appropriate to do so."  19 U.S.C. § 1517(b)(5).  CBP's regulations further provide that CBP may consolidate multiple allegations based upon whether the allegations involve relationships between the importers, the similarity of covered merchandise, the similarity of antidumping and countervailing duty orders, and overlap in time periods of entries of covered merchandise.  19 C.F.R. § 165.13(b).  CBP explained that all ten importers were alleged to have entered hangers manufactured in Vietnam, during the same period, all of which were covered by the AD/CVD Orders, and had a single common alleged manufacturer/exporter.  Initiation Notice at 12.  Given these commonalities from the outset, CBP's decision to consolidate the allegations into

---

[12] Leco does not challenge CBP's consolidation decision.

[13] The Government contends that its decision to consolidate investigations is not subject to judicial review.  Def.'s Resp. at 45.  CBP's decision to consolidate investigations is the type of interlocutory agency decision that is subsumed by its final determination and is therefore subject to judicial review.  *See supra* note 8.

a single investigation was not arbitrary and capricious, an abuse of discretion, or otherwise not in accordance with law.

The inquiry does not end there.[14]  Nevertheless, Leco has failed to identify a sufficient factual basis as to why it was entitled to an individualized analysis or determination in this case, other than asserting that Leco did not have a pre-existing connection with Truong Hong and that "many of the errors and omissions CBP identified in the production documentation are not present in the documentation submitted by Leco." Pl.'s Mem. at 25.  The record belies Leco's assertions.  Not only did CBP discuss in detail its finding that documents submitted by Leco were unreliable, *see* Admin. Review at 9; Remand Results at 30–37, but the agency also addressed the fact that Leco's general manager met with Truong Hong representatives in Vietnam, Admin. Review at 10–11.

Finally, Leco contends that, absent other evidence indicating evasion, Truong Hong's relationship with DNA does not support a finding of evasion.  *See* Pl.'s Mem. at 25–26.  Leco's contention fails because, as discussed above, there is a surfeit of evidence supporting CBP's evasion determination.  While the court need not consider whether this relationship alone supports a finding of evasion, the connections between Truong Hong and DNA bolster CBP's determination.  CBP found that one of Leco's points of contact to purchase hangers from Truong Hong was a "significant shareholder"

---

[14] The Government cites no authority for the notion that consolidation precludes different determinations as to different importers such that the court's affirmance of CBP's consolidation decision ends the inquiry.

in DNA, served as its Director-Legal Representative, and sat on its board of directors. RAAAS Mem. at 12.  The email address at which Leco contacted this representative was the same email address the representative used in his capacity as General Manager of DNA's predecessor[15] to submit questionnaire responses to Commerce in connection with its antidumping investigation.  *Id.* at 13.  Finally, CBP determined that Truong Hong's website had been registered to DNA.  *See id.* at 12.  Although Leco characterizes this relationship (i.e., shifting manufacturing to a country not subject to antidumping or countervailing duties) as an "entirely logical and lawful response of a business to the sudden imposition of [duties] on hangers produced in Vietnam," Pl.'s Mem. at 25, coupled with other record evidence indicating that evasion had occurred, Truong Hong's relationship with DNA reinforces CBP's affirmative evasion determination.

### III.   Whether CBP Complied with 19 C.F.R. § 165.4 and Provided Due Process to Leco

#### A. Parties' Contentions

Leco contends that "CBP's refusal to require rebracketing of documents not in compliance with [19 C.F.R. § 165.4(a)] . . . violates the [ ] Remand Order and CBP's own regulations, and is therefore arbitrary, capricious, an abuse of discretion and not in accordance with law."  Pl.'s Mem. at 26.  Leco further contends that its lack of access to information designated as business confidential information ("BCI") violated its due

---

[15] At the time of the investigation underlying the AD/CVD Orders, DNA was known as [[                                                                    ]].  *See* Evasion Determination at 6–7.

process rights.  *See id.* at 36–46.  Specifically, Leco argues that CBP erred in (1) allowing M&B to bracket the entire Market Research Report, *id.* at 29–31, 40–41; Pl.'s Reply at 14–16; (2) allowing M&B to bracket certain public information in its calculation of Truong Hong's alleged production capacity, Pl.'s Mem. at 31–32, 40–41; Pl.'s Reply at 14–16; (3) allowing M&B to bracket information in the Allegation Narrative derived from the Market Research Report and M&B's production capacity calculation, Pl.'s Mem. at 33; (4) bracketing the subject and central conclusion of two internal CBP memoranda, as well as continuing to bracket that information in the RAAAS Memorandum, *id.* at 33–35, 41–45; Pl.'s Reply at 16–17; and (5) refusing to provide Leco with entry data from other importers, Pl.'s Mem. at 39–40; Pl.'s Reply at 20–21.[16]

The Government contends that the bracketing and public summaries of all documents comply with CBP's regulation and are otherwise in accordance with law and that Leco has "failed to establish that . . . those summaries prevented it from advancing any arguments or placing any documents on the record that it otherwise would have." Def.'s Resp. at 32.

---

[16] Leco also suggests that the lack of an administrative protective order ("APO") mechanism violates its due process rights.  Pl.'s Mem. at 38–46.  The court has previously considered this assertion and concluded that the lack of such a mechanism does not, in and of itself, violate due process.  *See Royal Brush II*, 545 F. Supp. 3d at 1367 n.11 (declining invitation to impose an extra-statutory requirement akin to the APO procedure used in Commerce proceedings); *Royal Brush Mfg., Inc. v. United States*, 44 CIT __, __, 483 F. Supp. 3d 1294, 1306–1308 (2020) (finding that due process did not require CBP to provide an interested party with confidential information).  Leco advances no new arguments with respect to this issue and the court rejects Leco's suggestion for the reasons articulated in these *Royal Brush* opinions.

### B.  Additional Background

#### i.  EAPA Regulations

EAPA does not require or establish a procedure for the issuance of an APO

similar to the procedure used in antidumping and countervailing duty proceedings.

*Compare* 19 U.S.C. § 1517 (governing EAPA investigations), *with id.* § 1677f(c)(1)(A)–

(B) (establishing procedures for the disclosure of proprietary information pursuant to a

protective order in Commerce proceedings).  Instead, CBP has promulgated a

regulation governing the release of information provided by interested parties: 19 C.F.R.

§ 165.4.

Pursuant to 19 C.F.R § 165.4, interested parties may request that any part of its

submission to CBP be treated as BCI.  *Id*. § 165.4(a).  Information will only be treated

as BCI if it "consists of trade secrets and commercial or financial information . . .  which

is privileged or confidential in accordance with 5 U.S.C. § 552(b)(4)."  *Id*.  An interested

party claiming its submission contains BCI must explain why each item of BCI is entitled

to confidential treatment, *id*. § 165.4(a)(1), and provide "a summary of the bracketed

information in sufficient detail to permit a reasonable understanding of the substance of

the information," or, if claiming summarization is not possible, "a full explanation of the

reasons supporting that claim," *id*. § 165.4(a)(2).

#### ii.  Due Process

"The Fifth Amendment prohibits the deprivation of life, liberty, or property without

due process of law."  U.S. Const. amend. V.  Thus, "[t]he first inquiry in every due

process challenge is whether the plaintiff has been deprived of a protected interest in

'property' or 'liberty.'" *Int'l Custom Prods., Inc. v. United States*, 791 F.3d 1329, 1337

(Fed. Cir. 2015) (citation omitted).  While "engaging in foreign commerce is not a

fundamental right protected by notions of substantive due process," *NEC Corp. v.*

*United States*, 151 F.3d 1361, 1369 (Fed. Cir. 1998), an importer participating in an

administrative proceeding has a procedural due process right to "notice and a

meaningful opportunity to be heard," *PSC VSMPO-Avisma Corp. v. United States*, 688

F.3d 751, 761–62 (Fed. Cir. 2012) ("*Avisma*") (quoting *LaChance v. Erickson*, 522 U.S.

262, 266 (1998)); *see also Nereida Trading Co. v. United States*, 34 CIT 241, 248, 683

F. Supp. 2d 1348, 1355 (2010) (assuming that the plaintiff had "a protected interest in

the proper assessment of tariffs on goods already imported" and further examining

"what process is due") (citation omitted).  In general, "notice [must be] reasonably

calculated, under all the circumstances, to appri[s]e interested parties of the pendency

of the action and afford them an opportunity to present their objections."  *Transcom, Inc.*

*v. United States*, 24 CIT 1253, 1272, 121 F. Supp. 2d 690, 708 (quoting *Mullane v.*

*Cent. Hanover Bank & Tr. Co.*, 339 U.S. 306, 314 (1950)).  Such opportunity must occur

"at a meaningful time and in a meaningful manner."  *Mathews v. Eldridge*, 424 U.S. 319,

333 (1976).

        In determining "whether the administrative procedures provided [in a given case]

are constitutionally sufficient," the court undertakes a fact-based inquiry focused on

three factors: "the private interest that will be affected by the official action;" "the risk of

erroneous deprivation of such interest through the procedures used, and the probable

value, if any of additional or substitute procedural safeguards;" and "the Government's

interest, including the function involved and the fiscal and administrative burdens that

the additional or substitute procedural requirement would entail." *Id.* at 335.  The court

has found that, in the context of EAPA investigations, compliance with due process

requires that summaries of confidential information contain "sufficient detail to permit a

reasonable understanding of the substance of the information" such that they "provide[]

importers . . . an adequate opportunity . . . to respond to the evidence used against

them." *Royal Brush II,* 545 F. Supp. 3d at 1367.

### C.  Analysis

#### i.  CBP's Compliance with its Regulations

##### 1.  The Market Research Report, Exhibit 7, and Allegation Narrative

M&B requested proprietary treatment of the contents of two exhibits to its

evasion allegation, the Market Research Report, Public Allegation Exs., Ex. 4, and

M&B's calculation of how much equipment Truong Hong would need to produce the

volume of hangers it allegedly shipped to the United States ("Exhibit 7"), Public

Allegation Exs., Ex. 7.  M&B provided a limited public summary for both the Market

Research Report and the contents of Exhibit 7.  *Id.*  The Public Allegation Narrative also

contained information redacted in the Market Research Report, including details about

the location and ownership of Truong Hong and the number of containers allegedly

shipped from Laos to the United States during the period of review.  *Compare* Public

Allegation Narrative at 7–8, *with* Allegation Narrative at 7–8.  The Public Allegation

Narrative did not reveal certain information contained in the Market Research Report,

namely, the entities and persons from whom the market researcher obtained

information, the alleged number of workers employed by Truong Hong, and the alleged

number of hangers Truong Hong produced monthly.  *See* Public Allegation Narrative at

5–7.  Additionally, the Public Allegation Narrative did not provide the calculations

contained in Exhibit 7 estimating the number of machines that would be required to

produce the 376 containers of hangers that Truong Hong had reportedly shipped to the

United States over a twelve-month period.  *See* Public Allegation Narrative at 8.

Leco contends that the Market Research Report contains no trade secrets, and

that, even if it did, redaction of the entire document is not justified.  Pl.'s Mem. at 29.

Leco also challenges redactions made to Exhibit 7, contending that "the vast majority of

the information in [Exhibit 7] is publicly available and therefore ineligible for business

confidential treatment, and the remainder is not 'commercial or financial information.'"

*Id*. at 31–32 (asserting that the document should have been made entirely public).  Leco

contends that the lack of access to this information deprived it of the ability to review

and rebut the allegations of evasion.  *Id*. at 40–41.

When determining whether to treat submitted information as BCI, CBP relies on

the submitting party's explanation of why each redacted item is entitled to confidential

treatment.  *See* 19 C.F.R. § 165.4(a)(1).  CBP is subject to the Trade Secrets Act,

pursuant to which its officials may be liable for civil penalties for disclosing confidential

information in violation of law, and thus, as explained in the Remand Results, "CBP

must be cautious in exercising its discretion whether to reject a submission if there is a

possibility the information is trade secrets or commercial or financial information."

Remand Results at 24; *see also* 18 U.S.C. § 1905.  Thus, CBP must be afforded some

discretion to determine what information qualifies as confidential.

Nevertheless, CBP does not have unlimited discretion to defer to a party's

request for confidential treatment.  CBP must evaluate any request for confidential

treatment in light of publicly available information and information already on the public

record of the proceeding.  Here, while M&B requested confidential treatment for the

entire Market Research Report, M&B referenced certain of that information in its public

allegation.  *See* Def.'s Resp. at 36–37; *see also* Public Allegation Narrative at 5–8.

Thus, it should have been clear to CBP that this information should not have been

afforded BCI treatment elsewhere in the same record.

In this case, however, it does not appear that further court intervention is

warranted.  A public summary was provided by means of the Public Allegation Narrative

along with the limited public summaries of the Market Research Report and Exhibit 7.

Additionally, Leco received access to the confidential information in this litigation and

has not identified any information or arguments that it was unable to present at the

administrative level.  *See, e.g.*, Resp. to Def.'s Mot. for Voluntary Remand at 3, ECF

No. 40 (noting that Leco had reviewed the confidential administrative record pursuant to

a judicial protective order).  Absent any showing of prejudice to Leco, the court declines

to require further remand proceedings to adjust the locations of public information

otherwise already available to Leco.  Agency action will be "set aside 'only for

*substantial* procedural or substantive reasons.'"  *Intercargo Ins. Co. v. United States*, 83

F.3d 391, 394 (Fed. Cir. 1996) (emphasis added) (quoting *Sea–Land Serv., Inc. v.*

*United States*, 14 CIT 253, 257, 735 F. Supp. 1059, 1063 (1990), *aff'd and adopted*, 923

F.2d 838 (Fed. Cir. 1991)).

## 2.  Memoranda to File and RAAAS Memorandum

Leco also contends that CBP's bracketing of three agency memoranda did not

comply with CBP's regulations: (1) a January 27, 2020, Memorandum to the File

("January 27 Memo"); (2) a May 1, 2020, Memorandum to the File ("May 1 Memo," and,

together with the January 27 Memo, the "Memoranda to the File"); and (3) the RAAAS

Memorandum.  Pl.'s Mem. at 33–36, 41–42.

With respect to the January 27 Memo, CBP redacted the fact that the

[[                                   ]] had not been authenticated and that CBP was informed of this

lack of authentication by [[                                             ]].  Mem. to the File (Jan. 27,

2020), CRR 38, PRR 91, CJA Tab 29.  In the May 1 Memo, CBP redacted the

conclusions of the memorandum—[[



                                                                                              ]].  Mem. To the File (May 1,

2020), CRR 39, PRR 92, CJA Tab 71.  The RAAAS Memorandum similarly redacted

information bracketed in the January 27 Memo and May 1 Memo, as well as bracketing

the facts that the CBP Attaché [[

     ]], that [[                                                                          ]], and that the

CBP Attaché was [[                                                    ]] concerning certain

financial information.  RAAAS Mem. At 5.

Leco argues that this information does not qualify as trade secrets or commercial or financial information, and that disclosure of the bracketed information is unlikely to cause substantial competitive harm to any party or impair CBP's ability to obtain this type of information in the future.  Pl.'s Mem. At 34–35.

The court encourages CBP to be more transparent in its reasoning for protecting information from public disclosure.  Nevertheless, the court discerns that both the information received, and the source of that information, were treated as BCI as a condition of the source providing the information.  The information was received from a non-interested party, such that 19 C.F.R. § 165.4(a) does not apply and, as a matter of comity and respect for the separation of powers, the court declines to second-guess the agency's treatment of this information.[17]  Moreover, as with the Market Research Report and Exhibit 7, Leco obtained access to all confidential documents by means of the judicial protective order but made no substantive submissions or arguments based on that access.

### ii.  CBP's Compliance with Due Process

Leco argues that its inability to review the redacted information (or at the very least be provided with more detailed summaries of the redacted information) in the Market Research Report, Exhibit 7, the Memoranda to the File, and RAAAS Memorandum, as well as the entry data provided to CBP by other importers subject to

---

[17] Furthermore, to the extent that Leco contends that CBP failed to comply with 19 C.F.R. § 165.4(e), which requires CBP to provide a public summary of BCI placed on the record by CBP, the court finds that a public summary of the redacted information could not have been provided without divulging the source of the information.

the investigation, violated Leco's procedural due process rights.[18]  *See* Pl.'s Mem. 39–

45; Pl.'s Reply at 19–22; Oral Arg. at 43:40–43:46.  Leco has not demonstrated that its

lack of access to this information violated due process.

      The procedural due process rights to which Leco is entitled must necessarily be

viewed through the lens of the procedural rights parties are afforded under the statute

and regulations governing EAPA investigations.  In the absence of a statutorily provided

APO mechanism, Leco is not entitled to access to all confidential information,

particularly that protected from disclosure by other statutes such as the Trade Secrets

Act, 18 U.S.C. § 1905.  Leco has not established that it has any procedural due process

rights beyond obtaining public summaries of BCI "in sufficient detail to permit a

reasonable understanding of the substance of the information" such that it "provides

importers . . . an adequate opportunity . . . to respond to the evidence used against

them."  *Royal Brush II,* 545 F. Supp. 3d at 1367.  As the court has noted before, nothing

obligates CBP to establish "an extra-statutory requirement akin to the APO procedure

used in Commerce proceedings."  *Id.* at 1367 n.11.  With this in mind, the court

addresses Leco's various due process arguments.

      First, even without access to BCI, Leco was aware of the crux of the allegation—

that Leco had imported wire hangers that were transshipped from Vietnam through Laos

in violation of EAPA.  CBP's acceptance of requests for proprietary treatment for the

---

[18] While Leco frames its argument in terms of the *Mathews* balancing test, *see* Pl.'s
Mem. at 37–46, the bulk of Leco's argument focuses on the risk of erroneous
deprivation of its asserted private interest, namely, "the proper assessment of tariffs on
goods already imported."  *Id.* at 37.

particular formulas estimating the number of workers, machines, and hours worked at Truong Hong to produce wire hangers, the facts surrounding the site visit described in the Market Research Report, and the details of what entity confirmed CBP's suspicion that certain documents were inauthentic did not constrain Leco or Truong Hong from putting credible, verifiable information on the record detailing Truong Hong's actual production and export data. *See* Pl.'s Mem. at 40–41. It was Leco's burden to provide record evidence, such as accurate, verifiable certificates of origin, ASEAN Customs Declarations, and other production documents to demonstrate that its imports were manufactured by Truong Hong. *Cf. Zenith Elec. Corp. v. United States*, 988 F.2d 1573, 1583 (Fed. Cir. 1993) ("The burden of production should belong to the party in possession of the necessary information."). As discussed above, Leco and Truong Hong failed to provide this evidence.

With respect to the Memoranda to the File and the RAAAS Memorandum, Leco does not explain how CBP's treatment of the information as non-public violated its due process rights or affected its ability to respond to the evidence CBP used in making its determination. In fact, many of the documents placed on the remand record by Leco represented Leco's effort to respond directly to CBP's stated reasons for determining that the certificates of origin and ASEAN Customs Declarations were unreliable. *See generally* Def.'s Resp. at 40 (referencing CRR 1–27). Thus, the record shows that Leco was able to submit information and advance its argument that CBP's conclusions regarding the unreliability of these documents were incorrect. Leco has not shown that it was prejudiced by the redactions CBP made in the three memoranda. *Cf., e.g.,*

*Shinseki v. Sanders*, 556 U.S. 396, 409 (2009) ("[T]he burden of showing that an error is harmful normally falls upon the party attacking the agency's determination.").[19]

Finally, Leco contends that CBP's refusal to provide Leco with entry data placed on the record by other investigated importers deprived Leco of an opportunity to offer rebuttal information and argument.  Pl.'s Mem. at 39–40; Pl.'s Reply at 20–21.  Leco contends that with access to the entry data, it "could have offered rebuttal information and argument with regard to the fact that whereas [its] entry data shows the country of export as [[          ]], in many cases the entries of the other importers listed the country of export as [[               ]]".  Pl.'s Mem. at 39 (comparing RAAAS Mem., Attach. VIII, with RAAAS Mem., Attach. I).

Leco concedes that the details of the entry data are unquestionably the type of confidential information protected from disclosure by statute; nevertheless, Leco maintains that no public summary would adequately provide it with the opportunity to offer rebuttal information and argument.  *See id.* at 39–40.  Regardless, Leco fails to explain why the entry data was necessary for it to argue that its hangers were not transshipped and to rebut CBP's ultimate finding—that Truong Hong was not able to produce steel wire hangers in the quantities it shipped to the United States.  CBP made a finding of evasion specific to Leco in the administrative review, based on Leco's inability to provide sufficient information to establish that its imported wire hangers were

---

[19] Leco's counsel had full access to the confidential administrative record on remand and it is unclear how due process could have been violated by any redactions made in the public administrative record.

of Lao origin.  *See* Remand Results at 38; Admin. Review at 9–10.  The ratio of entries

listing [[                                                              ]] as the country of origin

had no bearing on Leco's ability to present additional evidence or argue that its entries

originated in Laos.[20]  In short, Leco was not deprived of its right to "notice and a

meaningful opportunity to be heard."  *Avisma*, 688 F.3d at 761–62.

Once again, the fact that Leco had access to the confidential record prior to the

remand underscores the futility of Leco's due process arguments.  On remand, Leco

had full access to the confidential record and, thus, had the ability to make any

arguments, or provide additional information, rebutting *all* record information which

detracted from its position.  Leco's argument that it was "unable to offer rebuttal

information or identify exculpatory information within the confidential record" in violation

of its due process rights, Pl.'s Mem. at 38, fails because the premise of Leco's argument

is not supported by the record.

## IV.   Whether CBP's Rejection of Leco's Untimely Submission was an Abuse of Discretion

### A. Parties' Contentions

Leco contends that CBP's refusal to accept Leco's untimely written arguments in

the remand proceeding was an abuse of discretion.  Pl.'s Mem. at 46–47.  Leco

suggests that because the submission was only six hours late, accepting the

submission would not have burdened CBP or "impact[ed] CBP's interest in finality," and

---

[20] To the extent that this is another variation on Leco's argument that Truong Hong had the capacity to produce the hangers that Leco imported, the court has rejected that argument above.

would have promoted the interests of accuracy and fairness in the proceedings.  *Id*. at

47.

The Government contends that CBP's regulations make clear that CBP has the

discretion to reject untimely submissions and that CBP did not abuse its discretion in

declining to accept Leco's submission.  Def.'s Resp. at 41.

### B.  Additional Background

During the remand proceeding, CBP invited parties to submit written arguments

relating to the revised public documents placed on the administrative record.  Letter

from Patricia Tran to Heather Jacobson, *et al.* (Sept. 3, 2021), PRR 82, CJA Tab 94.

Leco requested a five-day extension to file its written arguments, *see* [Leco] Req. for

Extension of Time to Submit Written Args. (Sept. 15, 2021) ("Extension Req."), PRR

105, CJA Tab 97.  CBP granted Leco five additional days; however, the agency

required that submissions be filed no later than 10:00 AM Eastern Time on that date.

*See* Resp. to [Extension Req.] (Sept. 17, 2021), PRR 106, CJA Tab 99.

Leco submitted its written arguments at 4:36 PM Eastern Time on September 27,

2021, six-and-a-half hours after the deadline.  [Leco] Cmts. on Draft Remand

Redetermination (Nov. 2, 2021) at 6–7, PRR 115, CJA Tab 101.  CBP rejected the

submission as untimely and informed Leco that it would not consider or retain Leco's

written arguments for the administrative record.  *Id*. at 7.  At 6:15 PM Eastern Time on

September 27, 2021, Leco submitted a request for an extension of the deadline and

acceptance of the written arguments.  Leco – Obj. to Rejection of Written Args. (Sept.

27, 2021), PRR 107, CJA Tab 100 ("Leco-Obj.").  Leco explained that the late

submission was caused by Leco's mistaken belief that the submission deadline was at

5:00 PM.  *Id*.  CBP rejected this extension request and did not accept Leco's written

arguments.  *See* Remand Results at 27–28.

### C. Analysis

Pursuant to 19 C.F.R. § 165.5(c)(2), untimely filed submissions will not be

considered by CBP or retained in the administrative record.  CBP may extend

submission deadlines upon request when CBP determines there is good cause for such

extension.  19 C.F.R. § 165.5(c)(1).  Absent extraordinary circumstances, however,

such extension requests must be submitted no less than three business days before the

deadline.  *Id*.

Courts traditionally afford agencies broad discretion to determine their own

procedures, including setting deadlines and enforcing them by rejecting untimely filings.

*See NTN Bearing Corp. v. United States*, 74 F.3d 1204, 1206–07 (Fed. Cir. 1995);

*Yantai Timken Co. v. United States*, 31 CIT 1741, 1755, 521 F. Supp. 2d 1356, 1371

(2007) ("In order for Commerce to fulfill its mandate to administer the antidumping duty

law, including its obligation to calculate accurate dumping margins, it must be permitted

to enforce the time frame provided in its regulations.").  However, an agency's discretion

to set and enforce deadlines is not absolute.  *NTN Bearing*, 74 F.3d at 1207.  A

deadline-setting regulation that "is not required by statute may, in appropriate

circumstances, be waived and must be waived where failure to do so would amount to

an abuse of discretion."  *Id.* at 1207.  In determining whether rejection of an untimely

filing amounts to an abuse of discretion, the court weighs "the burden imposed upon the

agency by accepting the late submission," *Usinor Sacilor v. United States*, 18 CIT 1155, 1164, 872 F. Supp. 1000, 1008 (1994), "the consideration of whether the information will increase the accuracy" of a determination, *see Pro-Team Coil Nail Enterprise, Inc. v. United States*, 43 CIT __, __, 419 F. Supp. 3d 1319, 1332 (2019), and "the need for finality at the final results stage," *Timken U.S. Corp. v. United States*, 434 F.3d 1345, 1353 (Fed. Cir. 2006).

Leco has failed to show that CBP abused its discretion in rejecting Leco's written arguments.  First, Leco has failed to show how the written arguments would have increased the accuracy of CBP's EAPA determination.[21]  At this stage in the proceedings, Leco had already furnished CBP with the additional factual information it wanted CBP to consider. *See* [Leco] Obj. to Revised Docs. Placed on the Record by [CBP] and [M&B] (Sept. 15, 2021) ("Remand Rebuttal Information"), PRR 103, CJA Tab 96; [Remand Rebuttal Information], Exs. 19–21 (Sept. 15, 2021), PRR 104, CJA Tab 95.  While Leco might have preferred CBP to interpret the factual record in a light more favorable to Leco, there is nothing to suggest that CBP's determination was less accurate in the absence of Leco's written arguments.

---

[21] There is no prior case law discussing abuse of discretion under the EAPA statute with respect to rejection of untimely submissions, and the court draws from case law discussing abuse of discretion in the context of antidumping and countervailing duty proceedings.  While EAPA determinations must also be accurate (i.e., determinations must be supported by substantial evidence), the nature of CBP's determination is different—rather than calculating a duty to be applied, CBP's determination is in the nature of an affirmative or negative evasion finding.

Court No. 21-00136                                                    Page 36

Second, CBP's interest in finality and the burden of accepting the late-submitted

arguments weigh heavily in favor of CBP.  Leco cites three cases in support of its

position: *Celik Halat ve Tel Sanayi AS v. United States*, 44 CIT __, 485 F. Supp. 3d.

1404 (2020); *Stupp Corp. v. United States*, 43 CIT __, 359 F. Supp. 3d 1293 (2019);

and *Grobest & I-Mei Indus. (Vietnam) v. United States*, 36 CIT 98, 815 F. Supp. 2d

1342 (2012).  These cases are inapposite.  In *Celik*, the court did not address the merits

of the plaintiff's claim that Commerce abused its discretion by rejecting untimely

responses.  485 F. Supp. 3d at 1412.   In *Stupp*, Commerce had rejected a

supplemental case brief because the plaintiff "exceeded the scope for supplemental

briefing," not because plaintiff had failed to comply with a deadline.  359 F. Supp. 3d at

1312–1313.  Finally, the burden for CBP to incorporate the late submission is greater

than it was in *Grobest*, when Commerce had seven months to process the late

submission before the deadline for releasing preliminary results and one year before

releasing its final results.  815 F. Supp. 2d at 1367.[22]  While Leco's submission was less

---

[22] Each of the cited cases arose in the context of antidumping and countervailing duty
proceedings.  Although both CBP's and Commerce's regulations regarding rejection of
untimely submissions and requests for extensions are similar, *compare* 19 C.F.R.
§ 165.5(c), *with id.* § 351.302, the context behind antidumping and countervailing duty
investigations and EAPA investigations is different.  It is well established that the
purpose of the antidumping and countervailing duty statute is remedial, not punitive.
*See, e.g.*, *Chaparral Steel Co. v. United States*, 901 F.2d 1097, 1103–04 (Fed. Cir.
1990).  This remedial nature has thus guided the court's consideration of whether
Commerce has abused its discretion.  *Id.*; *see also Grobest*, 36 CIT at 123, 815 F.
Supp. 2d at 1365.  Moreover, for antidumping and countervailing duty proceedings,
accuracy is of the utmost importance—detailed information is required in order to
calculate accurate dumping margins—and this importance is reflected in the statute.
*See* 19 U.S.C. § 1677m(d) (requiring Commerce to allow parties to correct deficient

than seven hours late,—the submission deadline was less than five weeks before CBP was required to file the Remand Results by court order.  *See* Pl.'s Mem. at 7–8; *see also* Remand Results at 28.

Leco has not shown that CBP abused its discretion in denying its request for an extension of time.  CBP's regulation is permissive, and timely extension requests may be granted only when CBP finds there is "good cause," while requests made less than three days before a deadline are subject to an extraordinary circumstances standard.  19 C.F.R. § 165.5(c)(1).  Rather than attempt to address either standard in its post-deadline extension request, Leco disputed the applicability of the regulation to the remand deadline, arguing that there is no constraint on CBP's ability to grant the requested extension.  Leco-Obj. at 1.  Regardless of the applicability of the regulation, Leco has failed to demonstrate that CBP abused its discretion by rejecting Leco's untimely extension request based on Leco's calendaring error.

---

submissions); *id*. § 1677m(i) (requiring verification of all information relied upon in final determination of investigations).  While EAPA investigations are not expressly designed to be punitive, the fact that the statute was designed to address evasion of U.S. antidumping and countervailing duties suggests that EAPA is more of an enforcement tool than a purely remedial one.  *See* Signing Statement for H.R. 644, 2016 WL 737735 (Feb. 24, 2016) ("[EAPA] will . . . heighten accountability throughout the [antidumping and countervailing duty] enforcement process, and more effectively counter attempts at duty evasion.").  In that vein, EAPA is designed to affect only those parties that enter merchandise by means of "material and false" statements or omissions.  19 U.S.C. § 1517(a)(5).  Also, as noted above, while antidumping and countervailing duty proceedings are for the purpose of calculating a duty rate, the result of an affirmative EAPA determination serves as a tool to collect previously established duties that would have been collected but for the occurrence of evasion.

**CONCLUSION**

Based on the foregoing, the court will sustain CBP's final determination of evasion as amended by the Remand Results.  Judgment will enter accordingly.


/s/       Mark A. Barnett
Mark A. Barnett, Chief Judge

Dated: January 24, 2023
        New York, New York